TELE-PAC, INC., Plaintiff, and VIDEO-CINEMA FILMS, INC., Respondent, v EDMUND C. GRAINGER, as Administrator C. T. A. of RAYMOND ROHAUER, Appellant.

First Department, May 30, 1991

### APPEARANCES OF COUNSEL

*Herbert P. Jacoby* of counsel *(Lacher & Lovell-Taylor,* attorneys), for appellant.

*Daniel Glass* of counsel *(Migdal, Pollack, Rosenkrantz & Sherman,* attorneys), for respondent.

### OPINION OF THE COURT

SULLIVAN, J. P.

■ The question presented by this appeal is whether an agreement which grants the right to distribute certain motion pictures "for broadcasting by television or any other similar device now known or hereafter to be made known" encompasses the videocassette and videodisc rights to the subject motion pictures. We hold that it does not.

On November 18, 1964, Tele-Pac, Inc., entered into an agreement with Video-Cinema Films, Inc. (Video Cinema) with respect to a package of 26 black and white motion pictures released between 1943 and 1953. Pursuant to paragraph 1 of the agreement, which set forth that Video Cinema is engaged in the business of distributing motion pictures for television, Tele-Pac granted Video Cinema "the license to distribute the [subject motion pictures] * * * for broadcasting by television or any other similar device now known or hereafter to be made known", including but not limited to "pay television, home television, theatrical television, etc."

In April 1986, Video Cinema and Tele-Pac commenced this

action against Raymond Rohauer,[1] seeking, *inter alia,* a declaration that defendant has no rights or interest in certain of the subject motion pictures. In addition, Video Cinema, in the eighth cause of action, the only cause of action remaining in the case, alleged that Rohauer's false claims of ownership of the renewal copyrights in seven of the motion pictures prevented it from selling the videocassette and videodisc rights therein to a third party, International Video Entertainment, Inc. (IVE), and sought damages resulting therefrom.

On September 25, 1987, after the commencement of this action, Rohauer and Tele-Pac entered into an agreement whereby the latter assigned to Rohauer "all of its right, title and interest of every kind and character, including the copyrights and any renewals of copyrights in the twenty-five (25) motion picture[s] * * * for the territory of the United States, its territories and possessions, Puerto Rico, Canada and United [Kingdom], but excepting therefrom the rights in the United States * * * previously granted to Video-Cinema Films, Inc. as per a contract dated 16 November 1964. * * * Without limiting the foregoing, the assignment of rights shall include all motion picture distribution and exploitation rights in all forms, gauges and media in the foregoing territories, with exception of the rights granted heretofore to Video-Cinema Films, Inc."

This agreement was the basis for defendant's counterclaim, asserted in an amended and supplemental answer dated July 11, 1988, which alleged that by virtue of the 1987 agreement defendant is now the owner in the United States of all videocassette and videodisc rights (video rights) in the 26 subject motion pictures, and that defendant sustained $100,000 in damages as a result of Video Cinema's purported grant of video rights in the motion pictures to IVE in 1984. (Defendant alleged that IVE, notwithstanding its cancellation of its 1984 agreement with Video Cinema, had assigned the video rights covered by the agreement to a third party as security for advances that had been made to it, that the security interest had been recorded in the United States Copyright Office and that the recording of the security interest consti-

---

1. Upon Rohauer's death, the executors of his estate were substituted as defendants. After one of the executors resigned and the sole remaining executor died, Edmund C. Grainger was appointed administrator *c.t.a.* of the Rohauer estate and, in that capacity, was substituted as defendant. The term "defendant" as used herein, refers to either Rohauer or the personal representative(s) of his estate, as appropriate.

tuted a lien against the video rights acquired by defendant which made it impossible for defendant to license such rights to third parties.)

Plaintiffs thereafter moved for partial summary judgment dismissing the counterclaim, asserting that pursuant to the 1964 agreement, Video Cinema had acquired the video rights in the subject motion pictures, and that therefore the 1987 agreement could not convey such rights to defendant. Submitted in support of the motion was the affidavit of Video Cinema's principal, the president of the company since 1962, which stated that both parties and their respective counsel "intended the language [in the 1964 agreement] 'any other similar device now known or hereafter to be made known' and 'home television' to encompass the device then known as a 'home TV video recorder' and its many possible applications."[2]

The IAS court granted the motion, holding that pursuant to the 1964 contract Tele-Pac transferred the video rights at issue to Video Cinema and that it therefore could not have transferred those same rights to defendant in 1987 (146 Misc 2d 1088).

Central to the IAS court's analysis was a definition of "broadcasting" as "being 'the act of transmitting sounds or images by radio or television.' (Webster's New Collegiate Dictionary 138 [1979 ed].)" *(Supra,* at 1090.) Reasoning that "[i]f these definitional words are substituted for the word 'broadcasting' in the 1964 grant clause, it would read as follows: 'for transmitting sounds or images by television *or any other similar device now known or hereafter to be made known.* This shall include *but not limit* the said license to pay television, *home television,* theatrical television, etc., throughout the Territories' " *(supra,* at 1090-1091 [emphasis in original]). The court found that "[t]his language * * * includes transmitting sound or images contained in a videocassette or videodisc via a VCR and a television set. It is not necessary that the transmission be over the air from a point geographically removed from the viewer; nothing in the 1964 grant clause requires that." *(Supra,* at 1091.) Thus, the court held that "broadcasting [the subject films] by television or any

---

2. There is no contention on appeal that the interpretation of the agreement presents a triable question of fact. We nevertheless note that in our view the contract is clear on its face, and thus the interpretation thereof presents a question of law which is appropriately determined on a motion for summary judgment. *(See, Chimart Assocs. v Paul,* 66 NY2d 570, 572-573; *Namad v Salomon Inc.,* 74 NY2d 751, 753.)

other similar device" includes "transmitting [such films] contained in a videocassette or videodisc via a VCR and a television set". We disagree and, accordingly, reverse.

The clause at issue does not itself expressly require transmission of sound and images from a point outside the home for reception by the general public—the definition of "broadcasting" which defendant urges us to adopt. Nevertheless, we believe that such a transmission is implicit in the concept of "broadcasting by television". Conversely, while one may speak of "playing", "showing", "displaying" or even perhaps "exhibiting" a videotape, we are unaware of any usage of the term "broadcasting" in that context. The term must be construed in accordance with its plain and ordinary meaning. *(Zuckerberg v Blue Cross & Blue Shield,* 108 AD2d 56, 59, *affd* 67 NY2d 688.) Even if we agree that videocassettes are "broadcast", the "broadcasting" device is a VCR or videocassette player, an entirely different device involving an entirely different concept and technology from that involved in a television broadcast. These differences, completely ignored by the IAS court but apparent even to the consumer unschooled in these technologies, preclude consideration of video equipment as a "similar device" vis-à-vis television.

In *Cohen v Paramount Pictures Corp.* (845 F2d 851 [9th Cir 1988]), the court examined the significant differences between the two media of communication.

"Television requires an intermediary network, station, or cable to send the television signals into consumers' homes. The menu of entertainment appearing on television is controlled entirely by the intermediary and, thus, the consumer's selection is limited to what is available on various channels. Moreover, equipped merely with a conventional television set, a consumer has no means of capturing any part of the television display; when the program is over it vanishes, and the consumer is powerless to replay it. Because they originate outside the home, television signals are ephemeral and beyond the viewer's grasp.

"Videocassettes [and videodiscs], of course, allow viewing of a markedly different nature. Videocassette entertainment is controlled within the home, at the viewer's complete discretion. A consumer may view exactly what he or she wants (assuming availability in the marketplace) at whatever time he or she chooses. The viewer may even 'fast forward' the tape so as to quickly pass over parts of the program he or she does not wish to view. * * *

"[Further, p]laying a videocassette on a VCR does not require a standard television set capable of receiving television signals by cable or by broadcast; it is only necessary to have a monitor capable of displaying the material on the magnetized tape." *(Supra,* at 853-854.)

At issue in *Cohen* was a license for the use of a musical composition in a certain film, conferring the right to exhibit the film "by means of television * * * including 'pay television', 'subscription television' and 'closed circuit into homes' television" *(supra,* at 853), which the court held did not include the right to distribute videocassettes of the film. The court found that the language at issue "must be tortured to expand the limited right granted by [the] section to an entirely different means of making that film available to the general public—the distribution of individual videocassettes to the general public for private 'performances' in their homes. The general tenor of the section contemplates some sort of broadcasting or centralized distribution, not distribution by sale or rental of individual copies to the general public." *(Supra,* 845 F2d, at 853.) Those conclusions are even more fitting here, where, unlike *Cohen,* the agreement did not convey a license for the "exhibition" of films by means of television, but was specifically limited to broadcasting.

■ *Cohen* cannot be distinguished on the ground that the 1964 grant involved herein does not, in contrast to the license in *Cohen,* explicitly reserve "all rights and uses in and to [the work in issue] except those herein granted". The right to "distribute films for broadcasting by television or any other similar device" is, by its own terms, sufficiently limited so that no express reservation of rights is required. Video Cinema points out that in *Cohen* the court found it significant that the parties "acknowledge[d]" that VCRs for home use were not invented or known in 1969 when the license therein was executed *(see, supra,* 845 F2d, at 854), while here, in contrast, Video Cinema argued before the IAS court that such devices were well known in the entertainment business in 1964 and referred to contemporaneous news articles which announced the marketing of home video recorders *(see, e.g.,* Oct. 1963 Popular Mechanics; Dec. 16, 1963 and July 15, 1964 Wall Street Journal). In *Cohen,* the parties' lack of knowledge was significant because of the grant's qualifying clause, which, since it reserved to the grantor all rights and uses "except those herein granted", was thus held to preclude all uses not then known to the parties. However, where, as here, the grant

was limited by its own terms, the parties' knowledge or lack thereof of the new technology is of little significance.

We are similarly unpersuaded by Video Cinema's attempt to analogize the 1964 grant to the contracts at issue in *Platinum Record Co. v Lucasfilm, Ltd.* (566 F Supp 226 [D NJ 1983]) and *Rooney v Columbia Pictures Indus.* (538 F Supp 211 [SD NY 1982], *affd* 714 F2d 117 [2d Cir 1982], *cert denied* 460 US 1084), which respectively granted the right to "exhibit" certain films by means of, *inter alia,* motion pictures, radio, television "or any other means now known or unknown" *(Rooney v Columbia Pictures Indus., supra,* 538 F Supp, at 223) and "by any means or methods now or hereafter known" *(Platinum Record Co. v Lucasfilm, Ltd., supra,* at 227). While these agreements were held to encompass the right to distribute the films on videocassettes and videodiscs, the decisions turned on the sweeping language of the grants involved, which, unlike here, contained virtually no limitation as to the medium in which the films could be exploited.

Minimizing the differences between the technology used by a television station and that used in a VCR, the dissent espouses the application of the "new use" doctrine. Under this approach, with respect to whether a grant includes a new use developed at a later time, "the licensee may properly pursue any uses which may reasonably be said to fall within the medium as described in the license." (3 Nimmer, Copyright § 10.10 [B], at 10-86; *see also, Bartsch v Metro-Goldwyn-Mayer, Inc.,* 391 F2d 150, 155 [2d Cir 1968].) Since we are of the view that the two technologies are so dissimilar as to preclude consideration of video rights as even falling within the "ambiguous penumbra" of the terms used in the agreement (3 Nimmer, Copyright § 10.10 [B], at 10-86), reliance on the doctrine does nothing to advance the dissent's position. *(Cf., Rooney v Columbia Pictures Indus., supra; Platinum Record Co. v Lucasfilm, Ltd., supra; Bartsch v Metro-Goldwyn-Mayer, Inc., supra.)* Indeed, television and VCR technology "have very little in common besides the fact that a conventional monitor of a television set may be used both to receive television signals and to exhibit a videocassette" or videodisc. *(Cohen v Paramount Pictures Corp., supra,* at 854.)

■ Finally, Video Cinema contends that the term "home television" in the granting clause of the 1964 agreement is "a clear reference, in the imperfect nomenclature of that time, to the new video recorder technology." Read in context, however, the term is more rationally construed as a reference to noth-

ing more than conventional over-the-air television broadcasts. Moreover, if we accept Video Cinema's argument, we must conclude that this "carefully crafted" agreement, which, while only four pages in length, was "the product of protracted negotiations spanning a period of approximately five months", left the subject of conventional over-the-air television broadcasts—the then customary method of television usage and the only medium through which Video Cinema has actually exploited the films—to be encompassed by the term "etc.", an appendage to the different forms of television specified in the grant. This simply makes no sense. Even more far-fetched are the constructions of "pay television" and "theatrical television" which Video Cinema urges us to adopt.

We take issue with the dissent's conclusion, in support of its construction of the grant, that there was a "consistent course of conduct over the years and consistent acquiescence by Tele-Pac in Video-Cinema's interpretation". Since the interpretation of the agreement presents a pure question of law, there is no need to resort to extrinsic evidence. *(See, Mallad Constr. Corp. v County Fed. Sav. & Loan Assn.*, 32 NY2d 285, 291; *Chimart Assocs. v Paul, supra,* 66 NY2d, at 572-573.)* In any event, while the dissent cites Tele-Pac's failure to exercise videocassette and videodisc rights, this circumstance is probative of nothing and is no more significant than Video Cinema's failure, for many years, to exercise such rights. The dissent also relies on the statement of a nonparty that during a 1985 meeting Tele-Pac's principal "stated that she believed she had conveyed the videocassette rights to [Video Cinema] in 1964." Even if this statement were otherwise admissible, it has no probative value since her belief is irrelevant. In addition, the statement is hearsay. More telling, however, Video Cinema, although not contending that the interpretation of the clause at issue presents anything other than an issue of law, has injected the element of extrinsic evidence without including an affidavit from any officer or principal of coplaintiff Tele-Pac. Finally, the dissent cites the fact that in the 1987 quitclaim Tele-Pac did not warrant or represent that it still owned the videocassette or videodisc rights. Since, however, there was no warranty or representation in the 1987 quitclaim that Tele-Pac owned *any* rights, no inference can be drawn from its failure to represent its ownership of video rights.

We thus determine that the 1964 grant did not convey video rights in the subject films to Video Cinema. Therefore, in view

of Video Cinema's concession that, pursuant to the 1987 agreement between Rohauer and Tele-Pac, Tele-Pac transferred to Rohauer all rights to the subject films except the rights previously granted to Video Cinema in the 1964 contract, it follows that such rights passed to Rohauer under the 1987 agreement. We grant partial summary judgment in defendant's favor so declaring. *(See,* CPLR 3212 [g]; *E. B. Metal & Rubber Indus. v County of Washington,* 102 AD2d 599, 603.)* Although defendant never formally moved for such relief, he requested the same in his responsive papers and does so again on appeal. In any event, a motion for summary judgment searches the record and judgment may be awarded where appropriate. *(Fertico Belgium v Phosphate Chems. Export Assn.,* 100 AD2d 165, 171, *appeal dismissed* 62 NY2d 802.) There is no basis for awarding summary judgment as to any other issue.

Accordingly, the order of the Supreme Court, New York County (David B. Saxe, J.), entered on or about March 12, 1990, should be reversed, on the law, without costs or disbursements, plaintiff's motion for summary judgment dismissing the counterclaim denied, and partial summary judgment granted in favor of defendant to the extent of declaring that videocassette and videodisc rights in and to the subject films passed to Rohauer under the 1987 agreement between him and Tele-Pac.

Asch, J. (dissenting). Tele-Pac, Inc. and Video-Cinema Films, Inc. entered into an agreement in 1964 for the distribution of 26 motion pictures which had already been released in the theatres between 1943 and 1953. This agreement provided in pertinent part: "The Producer does hereby grant to the Distributor a license to distribute the said pictures set forth on Schedule A, in perpetuity, from the date hereof, for broadcasting by television or any other similar device now known or hereafter to be made known. This shall include, but not limit the said license to pay television, home television, theatrical television, etc., throughout the Territories."

The majority finds that this language precludes consideration of videocassettes and videodiscs as a "similar" device vis-à-vis television and would therefore reverse the order of the IAS court. I disagree and would affirm. Not only the exact language of this one clause, but the intent of the parties at the time the agreement was entered into and the extremely broad and completely unambiguous language of the entire

agreement leads inescapably to the conclusion that the agreement may fairly be read as including later developed media such as videocassettes. *(See, Platinum Record Co. v Lucasfilm, Ltd.,* 566 F Supp 226, 227.)

The majority disagrees with the reasoning of the IAS court that since broadcasting is "the act of transmitting sounds or images by radio or television" (Webster's New Collegiate Dictionary 138 [1979 ed]), that substitution of this definition in the clause of paragraph 1 above leads to the conclusion reached by IAS that: "[t]his language * * * includes transmitting sound or images contained in a videocassette or videodisc via a VCR and a television set. It is not necessary that the transmission be over the air from a point geographically removed from the viewer; nothing in the 1964 grant clause requires that. In this context, the transmission from a videocassette through a VCR connected to the viewer's television is no different from a closed circuit transmission via cable from a point outside the viewer's home to his television set. I find that the 1964 grant to Video-Cinema must have included closed circuit cable transmissions of the motion pictures (although those explicit words are not used in the grant) and it does not matter whether that transmission travels many miles from a cable service company or only a few feet from a VCR to its reception on the viewer's television screen." (146 Misc 2d 1088, 1091.)

Certainly, as the majority insists with a number of quotations from *Cohen v Paramount Pictures Corp.* (845 F2d 851 [9th Cir 1988]) there are differences between the technology used by a T.V. station and that used in a VCR, but all new uses will have such variations. With due respect to the Ninth Circuit court, to acknowledge this is not to end the discussion but only to begin it. The "preferred" approach when dealing with a new use which lies within an "ambiguous penumbra", is to hold that "the licensee may properly pursue any uses which may reasonably be said to fall within the medium as described in the license. This would include uses within the ambiguous penumbra since, if whether or not a given use falls within the description of the medium as ambiguous it must, by definition mean that it is within the medium in a reasonable sense" (3 Nimmer, Copyright § 10.10 [B], at 10-86; *see also, Bartsch v Metro-Goldwyn-Mayer, Inc.,* 391 F2d 150, 155 [2d Cir 1968]).

Further, *Cohen (supra),* relied on by the majority, dealt with different facts. In that case, the agreement contained language

of limitation and reservation of rights *not* present in the 1964 agreement before us. The *Cohen* court emphasized that the composer-licensor carefully limited his grant of performing rights, explicitly reserving all rights not granted. In addition, that court emphasized that both *Platinum Record Co. v Lucasfilm, Ltd. (supra)* and *Rooney v Columbia Pictures Indus.* (538 F Supp 211), which it distinguished, contained "sweeping language" *(Cohen v Paramount Pictures Corp., supra,* at 855) granting the right to exhibit films by any means then known or unknown, which language more closely approximates that before us.

Finally, I note that for some 25 years the parties to the 1964 agreement acted as if the agreement included a grant of videocassette and videodisc rights. The principal of Tele-Pac never attempted to exercise any videocassette or videodisc rights. In fact, the record shows she admitted to a third party in 1985 that she had granted such rights to Video-Cinema in 1964. In 1987 this principal of Tele-Pac, while making over the quitclaim to defendant, refused to and specifically did not warrant or represent that Tele-Pac owned the videocassette or videodisc rights any longer, simply granting defendant all rights to the films "with exception of the rights granted heretofore to Video-Cinema Films, Inc.". This consistent course of conduct over the years and consistent acquiescence by Tele-Pac in Video-Cinema's interpretation is the best and indeed conclusive evidence of the intent of the parties at the time the contract was entered into. *(See, Filmvideo Releasing Corp. v Hastings,* 446 F Supp 725, 728-729, *affd* 594 F2d 852 [2d Cir 1978].)

ROSENBERGER, ROSS and SMITH, JJ., concur with SULLIVAN, J. P.; ASCH J., dissents in a separate opinion.

Order, Supreme Court, New York County, entered on or about March 12, 1990, is reversed, on the law, without costs or disbursements, plaintiff's motion for summary judgment dismissing the counterclaim denied, and partial summary judgment granted in favor of defendant to the extent of declaring that videocassette and videodisc rights in and to the subject films passed to Rohauer under the 1987 agreement between him and Tele-Pac.