Kenneth E. RAINE, as Trustee
of the Film Funds Trust
Funds, Plaintiff,

v.

CBS INC., formerly known as Columbia
Broadcasting System, Inc.,
Defendant.

No. 96 Civ. 7863(AGS).

United States District Court,
S.D. New York.

Nov. 20, 1998.

Steven J. Mandelsberg, Eric A. Lidman, Hahn & Hessen LLP, New York City, for Plaintiff.

Susanna M. Lowy, Cameron A. Stracher, Litigation Counsel, CBS, New York City, Robert G. Sugarman, Ronald R. Rossi, Weil, Gotshal & Manges, LLP, New York City, for Dfendant.

## OPINION and ORDER

SCHWARTZ, District Judge.

In this breach of contract action, plaintiff Kenneth E. Raine, as Trustee of the Film Funds Trust Funds (the "Trustee"), seeks to collect revenue from defendant CBS, Inc. ("CBS") pursuant to the terms of two Television Film Trust Agreements (the "Trust Agreements") entered into by the parties in the 1950s. The essential requirement of the Trust Agreements is that producers and distributors are to make royalty payments to plaintiff for their use or exhibition of certain covered films ("Covered Programs") that involve performances by members of the American Federation of Musicians ("AFM").

Relying almost exclusively on the language of the Trust Agreements, plaintiff claims that he is entitled as Trustee to royalty payments for the following: (1) CBS's exhibition of Covered Programs on cable television; (2) CBS's exhibition of Covered Programs on videocassettes intended for home viewing; (3) CBS's share of Copyright Royalty Tribunal ("CRT") payments for Covered Programs; (4) CBS's exhibition of the "Very Best of Ed Sullivan" television specials; and (5) 5% of 100% of CBS's revenues from television broadcasts of the "We Love Lucy" programs.

In addition, plaintiff seeks to conduct a further audit of CBS's records to determine the precise amounts due for cable, videocassette and the "Very Best of Ed Sullivan" specials.[1] Finally, plaintiff seeks attorney's and accountant's fees.

CBS contends that the Trust Agreements do not entitle plaintiff to royalty payments for cable or videocassette exploitation and that plaintiff has failed to prove that he is entitled to such payments. CBS argues that even though cable television existed at the time the Trust Agreements were executed, the agreements were not intended to cover cable broadcasts.[2] Likewise, CBS argues

---

1. Shortly prior to trial, plaintiff conducted an audit of CBS's records. (See 2/17/98 Tr. at 38; Boyle Dec. ¶¶ 40–44.)

2. Plaintiff makes much of the fact that CBS's position as to the existence of cable television in the 1950s has not been consistent throughout the course of this litigation. Regardless of its theory

that the Trust Agreements were not intended to cover videocassettes intended for home viewing. CBS also contends that CRT royalties are not covered by the Trust Agreements. Finally, CBS maintains that plaintiff is only entitled to recover 5% of 46% of the revenues from its television broadcasts of the "We Love Lucy" programs, the defined royalty for "The Luci–Desi Comedy Hour" programs. Because plaintiff is not entitled to any of the relief he seeks, CBS maintains that no further audit is required and that it is not responsible for the payment of any fees.

The case was tried to the Court on September 14, 15, 16, 25, and 29, 1998. For the reasons set forth below, judgment will be entered in favor of defendant on all of plaintiff's claims. Pursuant to Fed.R.Civ.P. 52(a), the Court's findings of fact and conclusions of law follow.

### FINDINGS OF FACT

#### A. *Background*

1. Plaintiff is the Trustee of the Trust Agreements, and was so designated by the U.S. Secretary of Labor in 1972. (PX[3] 13). He is a citizen of New Jersey. (JPTO at 10.)

2. CBS is a New York corporation authorized to do business in New York, with its principal place of business in New York, New York. (*Id.*)

3. In 1951, 1954, and 1959, CBS and other producers and distributors of television programs entered into various separate agreements with the AFM, three sets of which are relevant in this case: (1) the National Television Agreements, also called the "Radio and Television Agreement" and the "National Radio and Television Agreement" (the "Live Agreements"), (PX 32, 33, 34)[4]; (2) the Television Film Labor Agreements (the "Labor Agreements"), (PX 8, 9, 10); and

(3) the Television Film Trust Agreements (the "Trust Agreements"), the agreements at issue in this lawsuit, (PX 1, 2, 3).

4. At the time the parties negotiated the first set of agreements—that is, in 1951—the AFM and its then President James C. Petrillo were concerned about the effect that "canned" or "mechanized" (recorded) music would have on employment opportunities for AFM members. The concern over recorded music began as early as 1929 when movie soundtracks were introduced, causing a concomitant loss of employment for AFM theater orchestras. Thereafter, the concern grew with the introduction of recorded music by record, film, and other newly-emerging technologies. (McDermott Dec. ¶¶ 26–27.)

5. To combat the use of recorded music and promote employment opportunities for its musicians, the AFM created a Recording and Transcription Fund in the early 1940s that required royalties to be paid to the AFM for the use of recorded music. That fund was later replaced by the Music Performance Trust Fund because, pursuant to the Taft–Hartley Act passed in 1947, AFM could not receive direct payment of royalty monies from recording companies and broadcasters. This Trust Fund later became the Television Film Trust Fund subject to the provisions of the Trust Agreements. (McDermott Dec. ¶¶ 28–31, 34.)

6. Petrillo, representing the AFM, proceeded in the early 1950s to negotiate a number of different agreements with the television networks. At that time, Petrillo and the AFM had considerable bargaining power over movie studios, the recording industry, and broadcasters. (McDermott Aff. ¶ 33.) The AFM sought to ensure in these agreements that there would be payment of royalties for industry use of any recorded

---

for excluding cable from royalty payments, however, CBS has always maintained that it is not required to remit royalty payments to plaintiff for exhibition of Covered Programs on cable broadcasts.

**3.** References to "PX" are to plaintiff's trial exhibits received in evidence; references to "DX" are to defendant's trial exhibits received in evidence; references to "JPTO" are to the undisputed facts section of the parties' Joint Pre–Trial Order; ref-

erences to "Tr." are to the Trial Transcript unless otherwise denoted; and references to "Dec." are to witnesses' direct testimony, which the Court received by affidavit or declaration.

**4.** The parties marked all of their trial exhibits separately despite the fact that there is significant overlap between them. To avoid confusion, where both parties have marked an exhibit that is in evidence, we cite only to plaintiff's exhibit.

music or music performances on television. (Tr. at 56–57.) As with any negotiation of an agreement, however, both the networks and the AFM had to compromise on certain issues. (McDermott Dec. ¶ 62; Herman Dec. ¶ 8; Tr. at 85–86.)

## B. *The Trust Agreements Key Provisions*

7. The substantive provisions of the 1951, 1954, and 1959 Trust Agreements, as they bear on the issues that are relevant in this case, are the same. (PX 2 and 3 at ¶ 1(a).)[5]

8. The Trust Agreements all provide for certain payments (5% of the gross revenues earned, or 5% of advertising revenues as to the 1951 and 1954 Trust Agreements) to be made to plaintiff when Covered Programs are exhibited on "television broadcasts," and that payments to plaintiff shall continue so long as any of the films described therein shall continue to be used as described therein. (PX 1 at ¶¶ 2(a), 2(a)(x), 2(z)(c); PX 2 at ¶¶ 2(a), 2(c), and Schedule 1; PX 3 at ¶ 2(a), 2(c).)

9. The Trust Agreements require each signatory to keep full and accurate records and accounts concerning "all transactions" that give rise to payments. Such records and accounts are to be kept in convenient form and pursuant to approved and recognized accounting practices. Plaintiff is entitled under all the Trust Agreements to audit these records. (PX 1–3 at ¶ 2(e).)

10. Each of the Trust Agreements charges plaintiff with the duty, right, and power "to commence action or to take any other proceedings as shall be necessary for the collection" of any sums that are due under the agreements. Plaintiff's "reasonable expenses, attorney's fees and other disbursements incurred in the collection of any such overdue sums shall be paid to the Trustee by the first party so defaulting and such payment shall be added to the trust fund." (PX 1–3 at 4(a).)

11. one provision in particular that appears with minor variations in all the Trust Agreements is at issue in this case. The 1951 Trust Agreement version of this provision reads as follows:

> [The parties agree that payments shall be made to the Trustee] in connection with the production or exploitation of motion picture films and/or sound tracks (*whether such films and/or soundtracks are recorded on film, wire, tape, disks, or in other forms now or hereafter known* ), which in whole or in part, embody pictures of members of the Federation ... rendering musical performances or which embody or are accompanied by performances by such instrumental musicians, produced by it pursuant to agreement of even date with such Federation, *which films and/or soundtracks are intended for exhibition and/or are exhibited on television broadcasts* by such first party, or, which shall be so exhibited by assignees, lessees, licensees, or other users deriving title, lease, license or permission thereto, by operation of law or otherwise, by, from or through such first party[.]

(PX 1 at ¶ 2(a) (emphasis added.) The 1954 Trust Agreement contains a nearly identical provision, but applies only to musical performances rendered between February 1, 1954, and January 31, 1959. (PX 2 at ¶ 2(a).) In

---

5. Plaintiff makes much of the fact that the 1959 Trust Agreement represented a "drastic" change and an "entirely new approach" from the 1951 and 1954 Trust Agreements. (Pl. Post-Trial Reply at 4 (citing PX 39 at 1, Tr. at 317–18, 506).) He does so in an effort to prove that the testimony of CBS witnesses Richard Goldstein and Thayer Drake, individuals who were directly involved in the negotiation of the 1959 Trust Agreement, are not relevant to prove the intent of the parties to the 1951 and 1954 Trust Agreements. The Court rejects that proposition in its entirety. The "drastic" changes to the 1959 Trust Agreement did not alter the basic thrust of the Trust Agreements nor did they pertain to the claims at issue in this case.

Rather, the 1959 Trust Agreement, like its predecessor 1954 Trust Agreement, unequivocally states that "[s]ome of the first parties are signatories to prior Trust Agreements ... relating to subject matter similar to that dealt with by this agreement, and are incorporating into this agreement *substantially the terms, conditions and provisions* of such prior Trust Agreements." (PX 3 at ¶ 1(a); PX 2 at ¶ 1(a).) Accordingly, even though Goldstein and Drake were not directly involved in negotiating the 1951 and 1954 Trust Agreements, their testimony is highly probative and relevant on the issue of the intent of the parties as to all of the Trust Agreements.

addition, the 1954 agreement contains the clause, "*whenever* such films are exhibited on television broadcasts...." (*Id.*) (emphasis added).) Likewise, the 1959 Agreement states that it applies to musical performances rendered between February 1, 1959 and June 30, 1962, and contains the clause "*whenever* such films...." (PX 3 at ¶ 2(a) (emphasis added).)

### C. *Live and Labor Agreements*

12. Although plaintiff seeks relief in this case only under the Trust Agreements, the other agreements executed by the AFM and the networks at the same time as the Trust Agreements are relevant to the issues in this case.

13. The Live Agreements (also executed in 1951, 1954, and 1959) governed the wages, working conditions and other benefits of AFM members who performed on television programs that were broadcast live or recorded live on kinescopes and then re-broadcast. (PX 32, 33, 34.)

14. Kinescopes were precursors to videotapes and were made by affixing a television camera to a television monitor and recording a program as it was being broadcast live. The Live Agreements specifically authorized the use of kinescopes for the re-broadcast of programs to areas that could not receive a direct network feed, or for areas where time zone differences made live broadcasts inappropriate. (PX 32 at ¶ 4(B); Drake Dec. ¶ 10; Goldstein Dec. ¶ 8.)

15. Under the Live Agreements, payments for re-use of kinescopes were to be negotiated by the AFM and made directly to the musicians who performed on the programs. (Goldstein Dec. ¶¶ 8, 9; PX 161 and 162.[6])

16. The Trust Agreements were also negotiated and entered into simultaneously with the Labor Agreements. (PX 1, 2, 3, 8, 9, 10; Drake Dec. ¶ 10; Goldstein Dec. ¶ 11.) Indeed, the Labor Agreements actually required that first-party signatories also sign the Trust Agreements (PX 8, 9, 10 preamble; Drake Dec. ¶ 10; Goldstein Dec. ¶ 11.)

17. The Labor Agreements governed the wages, working conditions, and other benefits for AFM members who performed on television programs during a certain time period that were recorded on film. (PX 8, 9, 10; Drake Dec. ¶ 10; Goldstein Dec. ¶ 10.) The Labor Agreements did not apply to live recordings on film or live recordings made on kinescope that were later re-broadcast. (PX 8 preamble ("This agreement shall not apply to film made pursuant to Paragraph 4 of the National Television Agreement"); PX 9 at ¶ 1(b); PX 10 at ¶ 1(D); PX 37 (where CBS's chief negotiator of Labor and Trust Agreements stated that the Labor Agreement "applies to every type of recording on film, whether on motion picture film or by means of television recordings or kinescopes, except for that particular class of kinescopes specifically covered by the [Live Agreement].").)

18. Payments for re-use of films made pursuant to the Labor Agreements were made to the trust fund established under the Trust Agreements. (Drake Dec. ¶ 10; Goldstein Dec. ¶ 12.)

19. The Labor Agreements provided that written permission from the AFM was required of the networks before they granted any rights to use film and/or soundtrack (recorded under the terms of the Labor Agreements) that embodied pictures of musicians rendering musical performances "for purposes other than exhibition on television broadcasts where no admission is charged for the privilege of attending such exhibition either before, during, or after transmission over television." (PX 8 and 9 at ¶ 4; PX 10 at ¶ 10(B).) The Labor Agreements also provided, however, that plaintiff, as Trustee of the Trust Agreements, could enforce compliance with that requirement. (*Id.*)

---

6. These exhibits, consisting of summary judgment declarations signed by Goldstein in an unrelated lawsuit initiated by plaintiff, were admitted into evidence as impeachment material with regard to Goldstein's testimony. (Tr. at 477–82, 485–90.) In fact, they are consistent with Goldstein's position concerning the "Very Best of Ed Sullivan" specials, and we do not find that he is biased or incredible. As will be discussed *infra*, even though Goldstein's position in this other litigation was rejected, we are not persuaded that the argument advanced here by CBS on a similar issue concerning the re-use of kinescopes should be rejected.

**D. *Communication Concerning Agreements to AFM and Network***

20. After the Live, Labor, and Trust Agreements of 1951 were executed, Petrillo reported the news of the agreements to AFM members in the International Musician. (Tr. at 57; PX 42 Ex. 13.) The article reproduced the text of each agreement and also contained the following message from Petrillo in block letters: "THE MOST IMPORTANT PART OF THIS CONTRACT IS THE 5 PER CENT THAT THE NETWORKS [ABC, CBS, AND NBC] HAVE AGREED TO PAY TO THE MUSIC PERFORMANCE TRUST FUND, BASED ON THEIR GROSS REVENUES RECEIVED FROM THE USE OF TELEVISION FILM." (PX 42 Ex. 13.)

21. William C. Fitts, CBS's chief negotiator of the Labor and Trust Agreements, circulated an internal memorandum dated April 2, 1951 discussing the 1951 Labor and Trust Agreements. (PX 37.) In that memorandum, Fitts explained that the "agreement covers only films employing the services of musicians produced by one of the networks. It does not cover films purchased, leased or licensed from other producers." (*Id.*) Fitts also described films produced by the networks as "films in the production of which the networks employ musicians." (*Id.*)

22. Fitts prepared internal memoranda regarding the 1954 and 1959 Labor and Trust Agreements as well. The 1954 memorandum notes that the Labor and Trust Agreements are identical except for two changes. The first change concerned provisions of the 1951 Labor Agreement that prohibited CBS from using a recorded sound track containing instrumental music in films that it produced. The 1954 Labor Agreement freed CBS from that restriction. Pursuant to the 1954 Agreement, CBS could elect whether to use live music or recorded soundtrack. Fitts explained that, "if we use live music, we will then be bound by the terms and conditions of the agreements and will be obligated to pay the royalties set out in the trust agreement." (PX 38.) The second change concerned CBS's ability under the 1954 agreements to choose between two different formulas in determining the amount of royalties owed under the Trust Agreements. (*Id.*)

23. Fitts's 1959 memorandum described "drastic changes" and an "entirely new approach" to the way in which the amount of royalties due under the Trust Agreements were calculated. (PX 39.) These changes are not relevant, however, to the issues in this case.

**E. *The Sources of Conflict***

**1. *Cable and Videocassette***

██ 24. As already noted, the Trust Agreements obligate CBS (and other first party signatories) to pay 5% of their "gross revenues" (or, in the case of the 1959 Trust Agreement, a sliding scale payment) to plaintiff whenever films that contain performances of AFM musicians, or pictures of AFM musicians performing, are exhibited on "television broadcasts." Films meeting these criteria are Covered Programs. (PX 1, 2, 3.)

25. On their face, the Trust Agreements do not specifically include or exclude cable television broadcasts or videocassettes that are intended for home viewing.[7]

26. The term "television broadcast" as used in all the Trust Agreements is an ambiguous term. Indeed, that term is nowhere defined in any of the Trust Agreements. (*See* Cole Dec. at ¶¶ 4–6 (discussing what the term "broadcast" means and explaining that it "encompasses different kinds of transmissions of programs," but nowhere stating that "television broadcast" means (or meant in

---

7. Plaintiff's witness Max Herman confirmed this by his testimony. Herman, a musician and AFM member who attended some of the 1954 Trust Agreement negotiation sessions, testified that he never heard any of the parties to the Trust Agreements agree to an exception to payment obligations. (Tr. at 87.) Herman also testified that he did not remember any discussion that the Trust Agreements would *not* cover all uses in perpetuity. (Tr. at 88.) Nonetheless, Herman was not able to confirm that the parties to the Trust Agreements affirmatively agreed to include cable and future technologies. (Tr. at 92.) Herman's testimony, though credible, simply does not establish as plaintiff urges that the parties to the Trust Agreements intended that any and all conceivable uses of television programs be included in the terms of the Agreements.

1951, 1954, and 1959) what the plaintiff contends in this case).)

27. The Trust Agreements discuss future technology only in that portion of ¶ 2(a) concerning the type of films and/or sound tracks included in the agreements. Paragraph 2(a) states that *films and/or sound tracks are* included "(whether such films and/or soundtracks are recorded on film, wire, tape, disks, or in other forms now or hereafter known)." (PX 1–3 at ¶ 2(a).) This language concerns the method of recording film, however, and not the scope of payment intended to be paid to plaintiff for the exploitation of Covered Programs.

28. The cable television industry was in existence in 1951 and was well established by the mid–1950s. (Tr. at 304.) At that time, the television broadcast industry was different and distinct from the cable television industry. (Cox Dec. ¶¶ 18–23; Jacoby Dec. ¶ 9 (portion of paragraph that was not stricken by the Court); Tr. at 539–41.) [8]

29. In addition to the words "television broadcast," other terms used in the Trust Agreements demonstrate that, despite the Trust Agreements' broad grant of rights, they were not intended to include cable television broadcasts and/or videocassettes intended for home viewing.

30. For example, the 1951 and 1959 Trust Agreements both refer to the "run" of a television film (triggering certain payment rights). (PX 1 at ¶ 2(z) (defining gross revenues); PX 3 at Schedule 1.) The term "run" relates to the broadcast of a television film over the facilities of a network like CBS. (Drake Dec. ¶ 24; Goldstein Dec. ¶ 14; Tr. at 344–45.) The term "run" had the same meaning in 1951 as in 1959, and it was *not* a term used to refer to cable television or videocassettes. (*Id.*) Moreover, a settlement agreement executed by CBS and plaintiff in 1985 (concerning unrelated proceedings), refers to the term "run" "as such term is commonly understood in the *broadcast television industry* and so defined in the 1959 [Trust Agreement]." (PX 4 at 4 (emphasis added).)

31. The 1954 Trust Agreement refers to "Station Time Charges." (PX 2 at Schedule 1B.) "Station time charges" are costs that are charged to a sponsor for the use of network air time and network facilities. These costs are not associated with or charged in connection with cable television and/or videocassettes. (Goldstein Dec. ¶ 15.)

32. The 1951 Live Agreement defines a "local broadcast" as "the broadcast of a program over the facilities of only one station which program is not broadcast by any means, over another station or other stations." As so defined, "local broadcast" did not include cable exploitation through a cable television system and also did not include videocassettes. (PX 32.)

33. The course of dealing between the AFM and CBS, subsequent to the execution of the Trust Agreements, demonstrates that neither cable television nor videocassettes were contemplated by the Trust Agreements. (Tr. 519–26; Schulzinger Dec. ¶¶ 23–31.)

34. Goldstein's and Drake's testimony concerning the parties' intent as to cable and videocassette royalties was both relevant and credible despite the fact that these individuals were not directly involved in the negotiations for the 1951 and 1954 Trust Agreements. (*See supra* note 5.)

35. A videocassette intended for home viewing is not a "television broadcast." (Jacoby Dec. ¶ 10.) The Trust Agreements do not therefore contemplate royalty payments for videocassettes intended for home viewing. Moreover, we find that it was not the intent of the parties to include payments to plaintiff for the "exhibition" of Covered Programs on videocassettes intended for home viewing. (Tr. at 519–26.)

36. Indeed, the parties intended for the words "television broadcasts" to mean free over-the-air television. Accordingly, they did not intend for the words "television broadcasts" to require payments to plaintiff for revenues derived from the exhibition of Covered Programs on cable television and/or vi-

**8.** To the extent plaintiff's expert on broadcast engineering, Anthony F. Cole, testified to the contrary, we reject his testimony.

deocassettes. (Drake Dec. ¶¶ 11, 24; Goldstein Dec. ¶¶ 13, 14; Schulzinger Dec. ¶¶ 26, 27.)

37. Even though the parties to the Trust Agreements were aware of cable television and other newly-emerging technologies, they did not specifically exclude these markets from coverage. Nonetheless, the parties intended to deal with supplemental markets only as they "became significant," and then "payments were negotiated." (Tr. at 525; Schulzinger Dec. ¶¶ 24–30.)

38. The evidence presented in this case about royalty payments on cable and/or videocassettes purportedly made to plaintiff by networks other than CBS does not prove that these types of exhibition are contemplated by the Trust Agreements. (Tr. at 116–117 (where George Vajda, plaintiff's business manager, claimed that "NBC makes payments on cable broadcasts, satellite television and everything."), 128–133; PX 50.)

39. CBS has never knowingly paid plaintiff royalties on cable or videocassettes. (Boyle Dec. ¶¶ 27–30, 39; DX 23–25; Tr. at 107–116.) [9]

### 2. Copyright Royalty Tribunal ("CRT")

██ 40. The CRT was established by Congress in 1976 to impose a statutory payment obligation on cable system operators who were intercepting and retransmitting copyrighted television programs without paying a royalty to the copyright holder. 17 U.S.C. § 111(c) and (d).

41. Because the Trust Agreements do not contemplate royalty payments for exhibitions on cable television, they likewise do not contemplate royalty payments for CRT revenues.

██ 42. Even if cable royalties were contemplated by the Trust Agreements,[10] plaintiff would still not be entitled to CRT royalties. The Trust Agreements require payment to plaintiff only when revenues are derived from the exhibition, licensing, leasing, or selling of Covered Programs. (PX 1, 2, 3.)

43. CBS has never knowingly paid plaintiff CRT royalties. (Boyle Dec. ¶¶ 27–28.[11])

### 3. Very Best of Ed Sullivan Specials

██ 44. Live broadcasts of films are governed by the Live Agreements, not the Labor and/or Trust Agreements. (PX 32, 33, 34.) Live broadcasts are not, therefore, Covered Programs under the Trust Agreements and no payments are due to plaintiff for the re-use of kinescopes of live broadcasts. (PX 37, Drake Dec. ¶ 10; Goldstein Dec. ¶¶ 8–9.)

45. The 1959 Trust Agreement states that the only programs covered by the Trust Agreements are programs "produced under the [Labor] Agreement." (PX 3 at ¶ 2(a).) As already discussed, the 1951 and 1954 Trust Agreements are also tied to the Labor Agreements. The Labor Agreements specifically exclude programs produced under the terms of the Live Agreements. (PX 8 preamble; PX 9 at ¶ 1(b); PX 10 at ¶ 1(D).)

46. The 1951 Fitts memorandum states that, "[t]he present agreement applies to every type of recording on film, whether on motion picture film or by means of television recordings or kinescopes, except for that particular class of kinescopes specifically covered by the [1951 Live Agreement, which are] kinescopes produced at a time when the live television show is being regularly broadcast by an owned or affiliated station." (PX 37 at ¶ 2.)

47. Under the Live Agreements, payments for re-use of television programs originally broadcast live and recorded on kinescope (or videotape) are made directly to the musicians who performed on the programs,

---

9. To the extent Mr. Vajda testified to the contrary, we find that testimony incredible. (Tr. at 95–101, 399–400, 403–06; Rosenthal Dec. ¶¶ 3–4.)

10. Plaintiff's contention that CBS has conceded it owes him CRT royalties if cable exploitation is covered by the Trust Agreements is rejected. (Pl. Post–Trial Mem. at 23.) The position CBS took concerning CRT royalties in its motion for summary judgment does not constitute a judicial admission.

11. Again, to the extent that Mr. Vajda testified to the contrary, we reject his testimony as incredible.

not to plaintiff. (Goldstein Dec. ¶ 9; PX 34 at ¶ 7(C)(ii).) [12]

48. The Ed Sullivan Show was originally broadcast live and recorded on kinescope (or videotape). (Drake Dec. ¶ 30; Boyle Dec. ¶ 47; Tr. at 124, 127.) Accordingly, the Ed Sullivan Show is governed by the Live Agreements and not the Labor or Trust Agreements. (*See* PX 8 preamble; PX 9 at ¶ 1(b); PX 10 at ¶ 1(D).)

49. The Very Best of Ed Sullivan specials are four two-hour specials, produced in 1991, consisting of present-day narration about the original Ed Sullivan Show and "clips" from the original Ed Sullivan Show. (DX 19–22.)

50. Because the Ed Sullivan Show is not a Covered Program, the Very Best of Ed Sullivan specials are also not Covered Programs.

51. Moreover, the Trust Agreements do not require first-party signatories who exhibit, but do not produce or distribute, Covered Programs to make any payment to plaintiff for that exhibition. (PX 37; DX 17; Drake Dec. ¶¶ 17–21; 25–27, 29; Goldstein Dec. ¶ 12; Tr. at 343–344.)

52. CBS did not produce, did not distribute, and does not own any rights to the Ed Sullivan Show or the Very Best of Ed Sullivan specials. (DX 19–21.[13])

53. The evidence submitted by plaintiff concerning other networks' payment for similar programs (i.e., "Seinfeld Meets Abbott & Costello" and "Kelsey Grammer Salutes Jack Benny") does not prove that CBS is obligated to remit the royalties claimed here. (PX 54–56.) Indeed, there is no evidence in the record to show that these programs were originally broadcast live as was the Ed Sullivan Show. More importantly, the agreements by other networks to pay the plaintiff for these shows were "entered into on a non-precedential basis," (PX 54), and "non-citable basis," (PX 55). Finally, the invoice concerning "Seinfeld Meets Abbott & Costello" indicates that plaintiff was paid nothing for the show. (PX 56.)

54. Plaintiff is not entitled to be paid royalties from CBS for the Very Best of Ed Sullivan specials. (Goldstein Dec. ¶¶ 8, 9, 16, 17, 19.)

### 4. *We Love Lucy*

■ 55. Pursuant to a 1985 Settlement Agreement between CBS and plaintiff (concerning two unrelated state court cases), the parties agreed that 100% of the gross revenues of the "I Love Lucy" show are subject to a 5% payment. (PX 5.)

56. CBS originally broadcast thirteen one-hour programs featuring Lucille Ball and Desi Arnaz entitled the "The Lucy–Desi Comedy Hour." (Boyle Dec. ¶ 45; PX 98.) These thirteen programs were produced on the following dates: June 28, 1957 (No. 1 show); September 27, 1957(2); November 15, 1957(3); December 20, 1957(4); February 14, 1958(5); June 16, 1958(6); September 19, 1958(7); December 19, 1958(8); March 6, 1959(9); May 5, 1959(10); June 30, 1959(11); October 19, 1959(12); and January 18, 1960(13). (Tr. at 244–46.)

57. The "I Love Lucy" show and "The Luci–Desi Comedy Hour" are not the same programs. (PX 98, 99.[14])

58. CBS has always paid plaintiff 5% of 46% of its revenues from its television broadcasts of "The Luci–Desi Comedy Hour" because only six of these thirteen programs are Covered Programs. (DX 38, 39 .) Plaintiff offered no proof that more than six of the thirteen programs are Covered Programs.

---

**12.** Erwin Price's testimony is not to the contrary. Indeed, Mr. Price testified that he *played* in the CBS Studio Orchestra and was *paid* by CBS directly. (Price Dec. ¶¶ 4, 5.) Price admitted that he did not know, however, whether CBS actually produced the Ed Sullivan Show. (Tr. at 124–25.)

**13.** Again, Price's testimony is not to the contrary. Although Fitts stated in his 1951 memorandum that films produced by the networks are "films in the production of which the networks employ musicians," (PX 37 at ¶ 2), and Drake's notes from the 1959 Trust Agreements negotiations indicate that "[w]here we employ the talent, we assume responsibility for the production," (DX 17), plaintiff has not demonstrated that CBS employed the "talent" for the Ed Sullivan Show.

**14.** Mr. Vajda testified that all the "Lucy" programs are repackaged versions of the "I Love Lucy" show. We find that testimony incredible. Indeed, the exhibits Mr. Vajda claimed he relied upon in concluding that all "Lucy" programs are "I Love Lucy" programs establish no such thing.

59. "We Love Lucy" and the "We Love Lucy Special" consists entirely of material from "The Luci–Desi Comedy Hour." (PX 99; Boyle Dec. at ¶ 46.)

60. Plaintiff is only entitled to 5% of 46% of CBS's revenues from "We Love Lucy" and the "We Love Lucy Special."

### 5. *Audit & Fees*

61. The Trust Agreements only permit plaintiff to audit records when he has a legitimate claim to certain funds. Moreover, reasonable expenses and attorney's fees are recoverable only if plaintiff actually proves that a Trust Agreement signatory has defaulted on a payment obligation. (PX 1 & 2 at 4(a).)

## PRIOR PROCEEDINGS

When plaintiff commenced suit on October 17, 1996, the case was assigned to Judge Denny Chin of this Court. After CBS answered, Judge Chin held a conference and ordered that discovery be completed by June 6, 1997. At the close of discovery, the parties cross-moved for summary judgment. Judge Chin held oral argument on the motions on February 17, 1998.

The parties contended that the Trust Agreements were unambiguous and that Judge Chin could decide as a matter of law whether the Trust Agreements contemplated the payments to which plaintiff insisted that he was entitled. (*See, e.g.,* Pl. MSJ Mem. at 2 ("resolution of this motion . . . turns *solely* upon the Court's interpretation of CBS's obligations arising from the Trust [Agreements]."); Def. MSJ Mem. at 20 ("Plaintiff's alleged entitlement to royalties . . . turns wholly upon the terms of the Television Film Trust Agreements . . . . [and] the only issue in dispute is the parties' respective interpretations of those Agreements."); 2/17/98 Tr. at 5 (where plaintiff's counsel stated to the Court, "we do think that the agreements are unambiguous.")).

Judge Chin, however, disagreed. He denied the cross-motions for summary judgment because he concluded that there was "some ambiguity in the agreements" and neither party had demonstrated what the actual intent of the parties was concerning cable and/or videocassettes when they entered into the Trust Agreements in the 1950s. (2/17/98 Tr. at 30; *see also id.* at 2, 6–10, 25–26.) Judge Chin also concluded that there were questions of fact in the case that precluded him from granting either party's motion. (2/7/98 Tr. at 32.)

Having denied the parties' cross-motions for summary judgment, Judge Chin indicated his preliminary view as to the reasonableness of both parties' interpretations of the Trust Agreements. (*See* 2/17/98 Tr. at 27–37.) The case was then scheduled to be tried before Judge Chin in August 1998. Because Judge Chin took ill, we agreed to have the case be reassigned to US

At trial, the parties presented new evidence as to intent and course of dealing— evidence that was not before Judge Chin on the parties' motions for summary judgment. This additional evidence clarified the ambiguities in the Trust Agreements and persuaded the Court as the trier of fact as to the parties' intent.

## DISCUSSION AND CONCLUSIONS OF LAW

### A. *Introduction*

The Court has subject matter jurisdiction in this case based upon diversity of citizenship of the parties. We discuss first the legal standards. that apply to plaintiff's claims. We then address the Court's legal conclusions as to each claim. Finally, we conclude by discussing plaintiff's reliance on the *Raine v. Gleason* cases.

### B. *Legal Standards*

■■■ Determining whether a writing or contract is ambiguous is a question of law for a trial court. *See Morse/Diesel, Inc. v. Trinity Indus., Inc.,* 67 F.3d 435, 443 (2d Cir. 1995) (citing *Sayers v. Rochester Tel. Corp. Supplemental Management Pension Plan,* 7 F.3d 1091, 1094 (2d Cir.1993)). Under New York law, which governs the Trust Agreements and the 1985 Settlement Agreement, "[c]ontract language is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the

entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Sayers,* 7 F.3d at 1095 (internal quotations and citations omitted); *see also Alexander & Alexander Servs. v. These Certain Underwriters at Lloyd's London,* 136 F.3d 82, 86 (2d Cir. 1998). A contract is not ambiguous when the language in it has "a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." *M.H. Segan Ltd. v. Hasbro, Inc.,* 924 F.Supp. 512, 525 (S.D.N.Y.1996) (internal brackets, quotations, and citations omitted).

 If the language of a contract is ambiguous, interpretation of the contract becomes a question of fact for the fact finder and extrinsic evidence of the parties' intent is admissible. *Seiden Assocs., Inc. v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir. 1992). The primary objective in contract construction is "to give effect to the intent of the [contracting] parties as revealed by the language they chose to use." *Bourne v. Walt Disney Co.,* 68 F.3d 621, 629 (2d Cir.1995) (citation omitted), *cert. denied,* 517 U.S. 1240, 116 S.Ct. 1890, 135 L.Ed.2d 184 (1996). To determine intent, the court should look to the contract as a whole and the parties' conduct. *Id.* at 627–29.

 In determining whether a contract encompasses new uses, "neutral principles of contract interpretation" should apply. *Boosey & Hawkes Music Publishers, Ltd. v. The Walt Disney Co.,* 145 F.3d 481, 487 (2d Cir.1998). Where the parties' intent cannot be ascertained, the court should determine the most reasonable reading of the contract and the burden of justifying a departure from that reading falls on the party advocating the departure. *Id.* at 488.

### C. *Ambiguity*

Judge Chin denied the parties' motions for summary judgment in this case because he found that the Trust Agreements, at least with respect to whether royalties on cable and videocassettes were contemplated by them, were ambiguous. That decision was sound for a number of reasons.

First, for example, the term "television broadcast," as used in each of the Trust Agreements, did not have a definite and precise meaning in the 1950s. Indeed, both parties submitted evidence to the Court upon which a reasonable fact finder could find that there was a reasonable basis for a difference of opinion as to what constituted a "television broadcast." Second, whether the term "television broadcast" included cable television was a question upon which there is a reasonable basis for a difference of opinion. Third, whether the term "television broadcast" included videocassettes intended for home viewing was also a question upon which there is a reasonable basis for a difference of opinion. Fourth, words and terms used in some or all of the Trust Agreements did not have a definite and precise meaning—words like "whenever," (2/17/98 Tr. at 24–26), "run," "station time charges," and even "producer." Finally, considering the fact that the Trust Agreements were only one set of a series of agreements executed simultaneously by the same parties, the Trust Agreements could not be evaluated as a matter of law without considering the other agreements.

Although he contended that his position was to the contrary, plaintiff did not ultimately disagree with Judge Chin's determination as to ambiguity. Plaintiff's counsel stated during oral argument that, "if all you had here were trust agreements entered into in 1951, '54, and '59, I think I would be hard pressed to disagree with you [that the agreements themselves are ambiguous], but you also have admittedly entered into settlement agreements in 1985 and 1993 [that could have but did not carve out exceptions for cable and videocassettes]." (2/17/98 Tr. at 9.)

These are just a few examples of the reasons why Judge Chin, who did not articulate all of the specific matter to which he was referring, was well justified in finding that he could not construe the Trust Agreements as a matter of law and that extrinsic evidence, particularly evidence bearing on the intent of the parties was necessary to interpret them. *See General Mills, Inc. v. Filmtel Int'l Corp.,*

195 A.D.2d 251, 599 N.Y.S.2d 820, 821–22 (App.Div.1993).

Having carefully reviewed the agreements at issue, the language in those agreements, and the other evidence that is in the record concerning the parties' intent and course of dealing, the Court now holds that the most reasonable interpretation of the Trust Agreements is the interpretation advanced by CBS.[15] We address each of plaintiff's claims in turn.

## D. *Plaintiff's Claims*

### 1. *Cable Television*

The Court concludes that cable television was not contemplated by the Trust Agreements even though the AFM had considerable bargaining power at the time they were executed. The interpretation of the Trust Agreements urged by plaintiff fails, *inter alia*, because it gives no effect to key terms in the various agreements such as "station time charges," "run," "local broadcast," and "television broadcasts."

It also fails because, despite the broad language in the Trust Agreements, the evidence in the record as to intent demonstrates that it was *not* the intent of the parties to include cable television exhibition. Only CBS offered credible evidence as to the intent of the parties in the 1950s concerning cable television and future technology. Plaintiff failed to rebut this evidence, and his claim that CBS's witnesses were not credible is rejected.

Accordingly, CBS is not obligated to pay plaintiff on its cable television exploitation of Covered Programs.

### 2. *Videocassette*

For the same reasons that cable exhibition is not included, videocassettes are likewise not included. Even more compelling, however, the Trust Agreements simply do not contemplate royalty payments for videocassettes that are intended for home viewing. Indeed, "broadcasting" does not encompass videocassette exhibition. *See, e.g., Tele–Pac, Inc. v. Grainger,* 168 A.D.2d 11, 570 N.Y.S.2d 521, 522 (App.Div.1991); *General Mills,* 599 N.Y.S.2d at 821.

Accordingly, CBS is not obligated to pay plaintiff on its videocassette exploitation of Covered Programs.

### 3. *CRT*

Because plaintiff's cable claim fails, his CRT claim also fails. Regardless of whether the Trust Agreements contemplated cable television royalties, however, there is still no support for the proposition that copyright royalties are owed to plaintiff. These types of royalties are clearly unrelated to the exhibition, licensing, leasing or selling of Covered Programs.

Accordingly, CBS is not obligated to pay plaintiff CRT royalties.

### 4. *Very Best of Ed Sullivan Specials*

Plaintiff's claim of entitlement to revenues from CBS's exhibition of the Very Best of Ed Sullivan specials fails for two reasons. First, plaintiff failed to demonstrate that the original Ed Sullivan Show was indeed a Covered Program under the Trust Agreements. Plaintiff mistakenly focused his attention on proving that kinescopes generally are covered under the Trust Agreements, contending that any position by CBS that kinescopes generally are not covered is untenable. The Court agrees. That is not the point here, however. The point here is that kinescopes produced at a time when a live television show was being regularly broadcast are *not* covered by the Trust Agreements. This class of kinescopes is covered by the Live Agreements.

The Ed Sullivan Show was originally broadcast live. Kinescopes of that live broadcast, therefore, are not covered by the Trust Agreements. Accordingly, the original

---

**15.** CBS correctly points out in its Post–Trial Reply Memorandum that plaintiff has relied almost exclusively in this case on testimony from his expert E. Patrick McDermott and the language of the Trust Agreements. Mr. McDermott's declaration, however, was largely excluded from evidence. (Tr. at 36–47.) The language of the Trust Agreements, without more, is insufficient to prove plaintiff's claims. If it were sufficient, plaintiff would have prevailed on his motion for summary judgment.

Ed Sullivan Show, and the Very Best of Ed Sullivan specials to which plaintiff is claiming entitlement to royalties, are not Covered Programs.

Second, and again despite the broad language, the Trust Agreements do not require first-party signatories who exhibit, but do not produce or distribute, Covered Programs to make payments to plaintiff. CBS did not produce, did not distribute, and does not own any rights to the Ed Sullivan Show or the Very Best of Ed Sullivan specials. To the extent that there is a conflict in the evidence concerning what "produce" means (i.e. Fitts memoranda and Drake notes), we conclude that CBS's argument is more reasonable on this point. Plaintiff failed to prove that CBS produced the Ed Sullivan Show. The only thing that plaintiff did prove is that the CBS orchestra used live music and paid the musicians directly for that live music.

For these two independent reasons, we conclude that CBS is not required to remit royalty payments for the Very Best of Ed Sullivan specials to plaintiff.

### 5. *We Love Lucy*

Plaintiff has failed to prove that he is entitled to 5% of 100% of the "We Love Lucy" shows. His claim that "We Love Lucy" is actually a repackaging of the "I Love Lucy" show is not supported by the record. Rather, these programs are comprised of material from "The Luci–Desi Comedy Hour,"—on which the plaintiff has always received 5% of 46% of gross revenues. Plaintiff offered no evidence to support a finding that he is entitled to anything more than 5% of 46% of "The Luci–Desi Comedy Hour."

Accordingly, CBS is not obligated to remit additional royalties to plaintiff for the "We Love Lucy" shows beyond 5% of 46% of its gross revenues.

### 6. *Audit and Fees*

Because we have concluded that plaintiff is not entitled to any of the payments he seeks, we also conclude that a further audit of CBS's records is unnecessary. Likewise, plaintiff is not entitled to recover any fees from CBS. Having concluded that plaintiff is not entitled to fees, we need not address CBS's objection to plaintiff's inclusion of certain exhibits relating to fees in his Post–Trial Reply Memorandum of Law.

### E. *Prior Cases as Precedents in this Case*

At trial, and in his motion for summary judgment, plaintiff relied upon other lawsuits he initiated to prove his entitlement to the payments at issue here. (*See* Pl. Post–Trial Mem. at 18 n. 4; Pl. Post–Trial Reply at 5, 9, 10, 12 n. 12; PX 20, 41.) Indeed, the Trust Agreements have been the subject of numerous other lawsuits, including at least two lawsuits against CBS alone.[16] Two cases, each of which settled (and to which CBS was not a party), raised issues that are arguably similar to some of the issues that have been litigated here. We address each case in turn and then explain why neither of them are relevant.

In one of these cases, *Raine v. Gleason,* 174 A.D.2d 531, 571 N.Y.S.2d 474, 475–76 (App.Div.1991), the court held, on an appeal from the dismissal of the case on a motion for summary judgment, that extrinsic evidence was inadmissible to prove that the Trust Agreement was not intended to apply to live performances. The court summarily stated, "The trust agreement is unambiguous, and its interpretation must be discerned from its four corners without resort to extrinsic evidence." *Id.* (citation omitted). Plaintiff contends that this is "the most relevant authority for determining whether films recorded on kinescope are subject to the [Trust Agreements]." (Pl. Post–Trial Reply at 9.)

In the other case, also entitled *Raine v. Gleason,* # BC086628 (Superior Court of Cal-

---

16. As recently as September 24, 1998 (as plaintiff cites in his post-trial reply memorandum), another court in this district ruled on cross motions in a case involving plaintiff and Paramount Pictures Corporation. *See Raine v. Paramount Pictures* *Corp.,* No. 97 Civ. 3553, 1998 WL 655545 (S.D.N.Y. Sept.24, 1998). The issues in that case, however, are not relevant to the issues that were before us in this trial.

ifornia, County of Los Angeles), the court conducted a settlement conference and hearing on motions by the parties on May 15, 1996. (PX 20.) Apparently, plaintiff had moved for summary adjudication on its allegation that defendants were required to pay 5% of their revenues for the use of "The Lost Honeymooners" show. (*Id.* at 1.) That motion was denied. (*Id.* at 1–2.) Defendants moved for summary judgment as to the issue of the re-use of kinescopes, apparently arguing that kinescopes were not covered by the 1954 Trust Agreement. That motion was also denied because the court found that defendants' interpretation of the 1954 Trust Agreement was unreasonable "based on the facts which defendants presented. . . ." (*Id.* at 2.) The court further stated that "[b]ecause the defendants['] cites to extrinsic facts [d]o not create an ambiguity for purposes of contract interpretation, the court interpreted the contract according to its plain language." (*Id.* at 3.)

These cases are not controlling for three reasons. First, neither of these cases proceeded to a full trial as here. Second, neither court in these cases was presented with the extrinsic evidence concerning intent and course of dealing that was presented and considered here. Indeed, in both cases, the courts construed the Trust Agreements *without* resorting to extrinsic evidence.[17] Finally, there is no evidence in the record to prove that the programs at issue in either of these other cases were live broadcasts as was the Ed Sullivan Show. Accordingly, plaintiff's reliance upon these cases is misplaced.

### CONCLUSION

For the reasons stated herein, judgment will be entered in favor of CBS on all the claims asserted against it. Plaintiff's request for a further audit of defendant is hereby denied. Likewise, plaintiff's request for fees is denied. The Clerk of the Court is directed to enter judgment in favor of defendant.

---

17. Plaintiff claims that the California court did consider extrinsic evidence. A careful reading of the hearing transcript proves otherwise. For purposes of defendants' summary judgment motion in that case, the court stated on the record that it interpreted the agreement at issue "ac-

The Clerk shall thereafter close the file in this action.

SO ORDERED.

cording to its plain language ." Even if that court did consider some extrinsic evidence, there is still nothing in the record to demonstrate that it considered the same type and/or amount of extrinsic evidence that was considered in this trial.