HARLEQUIN ENTERPRISES LIMITED, Plaintiff,

v.

WARNER BOOKS, INC., Donald Pendleton, and Scott Meredith Literary Agency, Inc., Defendants.

No. 86 Civ. 1580 (GLG).

United States District Court, S.D. New York.

July 11, 1986.

---

Patterson, Belknap, Webb & Tyler, New York City, for plaintiff; Thomas C. Morrison, Emily R. Remes, Paul Gardephe, of counsel.

Weil, Gotshal & Manges, New York City, for defendant, Warner Books, Inc., R. Bruce Rich, Judith R. Aisen, Mitchell Salem, of counsel.

Rembar & Curtis, New York City, for defendants, Donald Pendleton and Scott Meredith Literary Agency, Inc.; Frank R. Curtis, Mark W. Budwig, of counsel.

## OPINION

GOETTEL, District Judge:

Truth fears no trial.
    —Thomas Fuller, Gnomologica

Justice is truth in action.
    —Joseph Joubert, Pensées

Every man stands trial for his actions at one time or another. I have no fear of universal judgment or the verdict that, inevitably, must be handed down. . . .
    —Mack Bolan

        To Justice

Dedication, "Don Pendleton's MACK BOLAN, 'The Trial,'" (Gold Eagle 1986).

## PROLOGUE

In 1968, Don Pendleton, an aerospace engineer and part-time author, wrote a book called "War Against the Mafia." It was published by the then-fledgling Pinnacle Books Company ("Pinnacle"). It introduced to the male adventure-reading public a new hero named Mack Bolan. Bolan, trained by the military as a combat specialist and sharpshooter, returned from the Vietnam jungles to find that his family in the United States had been wiped out by the local Mafia. He launched a personal war against the Mafia, applying his military skills and tactics, to track down and kill its members wherever found. His was a crusade against evil. The back cover of the most recent Mack Bolan book, "The Trial," provides this description:

*I am not their judge. I am their judgment. I am their executioner.* With those words Mack Bolan, a Vietnam hero, embarked on an odyssey of blood that would mark him as the most controversial warrior of modern times.

With ultimate faith in his ability to make a difference, the justice fighter saw it his duty to protect the weak and the innocent from all-consuming evil.

"War Against the Mafia" and Mack Bolan were an immediate success. A series of 38 books written by Pendleton [1]—"The Executioner" series—followed. In the books, Bolan executed members of the Mafia all across the country. The constant element was killing on a massive scale. Terse dialogue spiced the violence. Each killing was described in explicit and gory detail. Paramilitary tactics, weaponry, and terminology were heavily emphasized. Pinnacle and its distributors termed this new type of "blood and guts" paperback "action-adventure."

The books followed a common format. Several quotations, including one from Mack Bolan, would open each book. (Typical is the quotation that begins this opinion.) A prologue would follow. Next, there would be numerous, relatively short chapters. Conflict and action occurred every few pages. After all of the bad guys had been administered their just deserts, an epilogue would close the story. The books usually ran a couple of hundred pages, had a simple plot line with no subplots, and were, in the words of the trade, a "quick read." Most covers portrayed Mack Bolan in a fighting posture, holding an exotic weapon.

"The Executioner" series spawned numerous imitators. Apart from competing books, which were usually unsuccessful, the series may have inspired popular motion pictures such as Charles Bronson's "Death Wish," Clint Eastwood's "Dirty Harry," and Sylvester Stallone's "Rambo."

By 1980, Pendleton had completed 38 books. He was also experiencing some medical problems and wished to give up the series, or at least to find someone else to do the heavy writing. Coincidentally, his editor-in-chief, Andrew Ettinger, had recently left Pinnacle to join Harlequin Enterprises Limited ("Harlequin"), a Canadian publisher, then known almost exclusively for its very successful sales of romance fiction.[2] Harlequin was interested in entering the men's action-adventure market. With Ettinger's intercession, Pendleton and his agent, the Scott Meredith Literary Agency, Inc. ("Meredith"), commenced discussions with Harlequin. In February 1980, they signed a preliminary letter agreement [3] pursuant to which Harlequin would acquire the right to use Mack Bolan and Pendleton's other characters in a continuation of the "Executioner" series. Spi-

---

1. Each of Pendleton's contracts with Pinnacle was for no more than one year. Pendleton averaged over three books a year during his twelve year tenure at Pinnacle.

2. Harlequin still issues these books under such imprints as "Harlequin Romance," "Harlequin Presents," and "Silhouette."

3. Pendleton's switch to Harlequin gave rise to an earlier lawsuit by Pinnacle against Harlequin for interference with its contractual relationship. Harlequin prevailed. *Pinnacle Books, Inc. v. Harlequin Enterprise, Ltd.,* 519 F.Supp. 118 (S.D.N.Y.), *aff'd w'out op.,* 661 F.2d 910 (2d Cir.1981).

noff series were also contemplated. Pendleton would not write the books himself. Instead, he would submit ideas, and Harlequin would contract with a stable of writers to produce the books in both "The Executioner" series and the spinoffs. In exchange, Pendleton was to receive royalties of 2 cents on each book sold, with a guaranteed minimum of $200,000 a year.[4] The rights to "The Executioner" series and its characters were Harlequin's for as long as it chose to publish the series.

Harlequin and Jack Scovil ("Scovil") of the Scott Meredith Agency proceeded to negotiate a more formal agreement. The Agreement somewhat diminished Pendleton's obligations to develop story concepts, merely requiring him to serve as a consulting editor. In addition, certain non-compete provisions were added. Harlequin's attorneys prepared a paragraph 6 that prevented Pendleton from competing "directly or indirectly" with the sale of "The Executioner" series in numerous defined respects.[5] They also added a paragraph 7 entitling Harlequin to injunctive relief for any breaches of paragraph 6 without proof of actual damages. These noncompete provisions were not customary in a publishing contract, but this was not a typical author-publisher agreement.

When Pendleton's agent saw paragraphs 6 and 7, he knew they were not acceptable to Pendleton, since, by their terms, they could arguably bar him from ever writing under his own name. Consequently, Scovil drafted an additional provision which became paragraph 8. It stated,

4. The parties envisioned monthly Mack Bolan books, as well as monthly issues of several spinoffs. Since the Mack Bolan books were then selling about a half million copies each, it was thought that gross sales might exceed $10,000,000 a year. The parties set the guaranteed minimum with these figures in mind. Their projections proved overly optimistic.

5. Paragraph 6 of the Agreement provides that Pendleton

   will not at any time, without the prior written consent of Harlequin, either individually or in partnership or jointly or in conjunction with any person or persons, firm, association, syndicate, company or corporation as principal,

Notwithstanding anything to the contrary in the provisions of Paragraphs 6 and 7 hereof, Pendleton reserves the right to create and/or write works for others, other than works which would compete with the sale of the action-adventure series contemplated in this Agreement, which Pendleton may publish or cause to be published in any language throughout the world, and all rights to which are solely the property of Pendleton.

Plaintiff's Exhibit 1, ¶ 8. A dispute as to the interpretation of this provision gave rise to this further adventure of Mack Bolan, and a trial.

## CHAPTER 1

### THE GOLD EAGLE SERIES

The Pendleton contract was the launching vehicle for Harlequin's "Gold Eagle" series—the title under which it was to publish all of its men's adventure stories. Since Mack Bolan had fairly well destroyed the Mafia (at least in fiction), Harlequin broadened the scope of Bolan's adversaries to include, *inter alia*, terrorists throughout the world. The theme shifted somewhat and was advertised under such slogans as

Fed up with America held hostage by the world's crazies?

Then set your sights ... and let Gold Eagle pull the trigger

and

Terrorists, anarchists, hijackers and drug dealers—BEWARE!

agent, director, officer, employee, consultant, investor or in any other manner whatsoever carry on or be engaged in or be concerned with or interested in or advise, lend money to, guarantee the debts or obligations of or permit his name or any part thereof to be used or employed by any such person or persons, firm, association, syndicate, company or corporation engaged in or concerned with or interested in any business that would compete, directly or indirectly with the sale of the Works or any of them in any country in which the Works are being distributed or sold.

Plaintiff's Exhibit 1, ¶ 6.

In a world shock-tilted by terror, Mack Bolan and his courageous combat teams, *SOBs* and our new high-powered entry, *Vietnam: Ground Zero* provide America's best hope for salvation.

Advertising insert in Gold Eagle Books. Consistent with its more global approach, Harlequin has down-played "The Executioner" title and featured Mack Bolan's name with all titles.

Pendleton's involvement with Harlequin gradually diminished. Initially, Pendleton was deeply involved in choosing Harlequin's writers and editing their manuscripts. He also wrote selected portions such as the prologues. However, in recent years, his involvement has been limited to assisting Harlequin in promotional matters including a Mack Bolan convention last year.

Although Pendleton did little of the writing, his name appeared on the cover in a manner suggesting that he was the author of the Mack Bolan books. By 1982, Pendleton had become unhappy with the latest Mack Bolan books. He advised Harlequin that since they were not following his advice, he wished them to cease using his name in this manner. (Harlequin had been advised by its counsel that this was a questionable practice.) In June 1982, Pendleton's attorney wrote Harlequin directing that it cease listing him as author or even co-author of future books. However, the parties then agreed that Pendleton would extensively rewrite the next three books and that his name could be used on those books. Thereafter, Pendleton indicated that his name should be removed from subsequent books. Harlequin countered that it had a right to use the phrase "Based on the characters created by Don Pendleton," on the cover, and Pendleton agreed to

this. (He now states that he assumed that Harlequin would also list a fictitious author.[6]) Still later, Pendleton, at Harlequin's request, agreed to change the "Based on ..." to "Don Pendleton's Mack Bolan." Pendleton saw the subsequent monthly books listing no other author, and understood that the average reader would assume that he was the author.[7] However, he raised no further objections to this deception.

In late 1982, Harlequin began marketing two spinoff series, "Able Team" and "Phoenix Force," both of which have enjoyed moderate success.[8] The Gold Eagle series today, at least that portion comprised of the Mack Bolan books and its two spinoffs, while not wildly successful, nevertheless has a substantial number of hard-core readers (some of whom buy each issue directly from the publisher). Overall, the sales of the individual Mack Bolan books gradually declined. But considering that Harlequin was publishing many more titles each year, the overall sales numbers remained impressive. Total sales (12 million books in six years) are respectable and quite profitable. (The 92nd book in the Mack Bolan series has just come out.) Recent world developments involving international terrorism may help the series even further.

## CHAPTER 2

### ASHTON FORD—MYSTIC EYE

By 1985, Pendleton had had enough vegetating. His health had improved, and he was about to remarry. His creative urges had again come to life. He planned two new projects. In the first, a book entitled "Sagittarius Rising," he would draw upon his knowledge of the aerospace

---

**6.** House pseudonyms are common in the publishing of series books, which are written as works for hire. The pseudonyms lend apparent continuity to the books though the actual writers change. Harlequin used pseudonyms on the two series spun off from "The Executioner" series.

**7.** The credits following the title page, listing the copyright information and rights, reservations,

etc., usually provide a terse statement giving "special thanks and acknowledgment" to the true author for his contributions to the work.

**8.** Harlequin is currently launching two more spinoffs, "SOB," and "Vietnam: Ground Zero." These are referred to in the above-noted advertising inserts. *See supra* p. 1084.

industry and rockets. His second project was a new series of books introducing a character named Ashton Ford. Pendleton dubbed Ford, a detective of sorts with some psychic powers, a "Mystic Eye." In his proposal to publishers, Pendleton offered "Ashes to Ashes" as the first in a new "mystery/mystical" series.

Pendleton's literary agent, Jack Scovil, of the Scott Meredith Agency, sought publishers for these new proposed works. Among the publishers whom they approached was Warner Books Incorporated ("Warner"), a subsidiary of a leading media-entertainment company.[9] Warner liked Ashton Ford's prospects and negotiated a six-book contract for an Ashton Ford series. The contract was signed on October 1, 1985.

Neither Scovil, Pendleton, nor anyone else had advised Warner, or any other prospective publishers, of the restrictions in Pendleton's contract with Harlequin. Warner knew that Pendleton had a contract with Harlequin, but Pendleton's agent had assured Warner that the proposed series did not violate that contract. In addition, the description of Ashton Ford, as "a brilliant young man who was never sure of what he wanted to do with his life and so became adept at everything from law to psychiatry to espionage and including powerful psychic gifts," Letter from Ted Chychak to Bernard Shir-Cliff (May 13, 1985), Plaintiff's Exhibit 61, clearly distinguished the new character from Mack Bolan.

Unaware of the non-compete provisions in Pendleton's Harlequin contract, Warner's promotional people launched a campaign intended to play upon the popularity of the Pendleton name and characters. Advertising blurbs to the trade proclaimed "Don Pendleton is back!" The front cover of each Ashton Ford book displayed Pendleton's name in letters over an inch high. Emblazoned within the name was the statement, "Creator of THE EXECUTIONER—the 57,000,000 copy—series." The book's front and back covers were obviously designed to exploit Pendleton's Mack Bolan action-adventure reputation.[10] The front cover of "Ashes to Ashes," a "big book treatment," is an expensive cutout (called a "gate fold") exposing a part of a full-page picture of a man (perhaps Ashton Ford) shooting a pistol, another man running with a gun, and an exploding helicopter. (The book makes no reference to a gun or an exploding helicopter.) The back cover emphasizes that Ashton Ford was a former naval officer and an adventurer whose knowledge of cryptology and philosophy is exceeded only by his capability with handguns. Neither Pendleton nor his agent was in any way involved in the promotion, which was, in fact, finalized without their approval.

In November 1985, Harlequin became aware of Warner's promotional efforts and advised Warner that it believed that the prospective series competed with the Mack Bolan series. Thereafter, the promotional materials and cover art have more accurately depicted the Ashton Ford series.[11]

Although the Ashton Ford series defies easy characterization, it might best be described as psychic detective with a science-fiction overlay. The three books completed to date emphasize mystical and supernatural themes, mixing parapsychology and the occult with detective suspense and sex. The latter is reminiscent of the hardboiled detective novels of the Raymond Chandler, Dashiell Hammett, James M. Cain genre, a type of fiction that Pendleton wrote many years ago. But Ford differs from such hardboiled detectives like Sam Spade, Philip Marlowe, and Mike Hammer not only in

---

9. Meredith belatedly offered the series to Harlequin for its Gold Eagle series. Harlequin's editors thought it flawed as action adventure because of its occult aspects. Instead, they considered it a detective thriller series and rejected it.

10. The cover of a popular paperback book (not a reprint of a hardcover) is its most important marketing device. Interestingly, the cover artists for the Harlequin's Mack Bolan books are paid almost as much as the authors.

11. The second Ashton Ford book, "Eye to Eye," is about to be published, and the third, "Mind to Mind" is slated for publication later this year.

possessing parapsychological powers but also in having (would you believe?) a trust fund! Ashton Ford does not shoot people, as does Mack Bolan. Indeed, there is only limited action in the books and almost no "blood and gore." The heroes are quite different (one witness described Ashton Ford as a "California Woody Allen") as are the narrative styles. The Ford books, in the hardboiled detective style, are told in the first person, while "The Executioner" series is in the third person. The plots and the use of female characters differ greatly. Nevertheless, Harlequin, maintaining that the series are similar in content, style, marketing, and promotion, brought suit against Warner, Pendleton, and his literary agent.

## CHAPTER 3

### THE REAL TRIAL

Harlequin commenced its action on February 21, 1986.[12] By then, the first book in the Ashton Ford series, "Ashes to Ashes," had been distributed throughout the country. The second book, "Eye to Eye," was not scheduled for distribution until late-June. The parties, therefore, agreed to expedite discovery with the hope of an early trial. The case went to trial on May 14, 1986, and consumed six trial days.

The plaintiff's complaint contains two causes of action. The first charges Pendleton and Meredith with breaching the May 15, 1980 Agreement. The second purports to state a claim against Warner and Meredith for tortiously interfering with Pendleton's contract with Harlequin. The complaint demands that Warner be enjoined from publishing and promoting "Ashes to Ashes" and all other books in the Ashton Ford series. It also asks that Pendleton, Meredith, and their agents be enjoined from assisting in the publication or promotion of the books. In his answer, Pendleton counterclaimed under section 43(a)

of the Lanham Act, 15 U.S.C. § 1125(a) (1982), to enjoin Harlequin from using his name in connection with any works not written by him.

The plaintiff's breach of contract claim has two aspects. First, the plaintiff alleges that Pendleton and Meredith breached the Agreement by authoring, selling the rights to, and promoting the Ashton Ford series. The second aspect involves Pendleton's use of his own name as author of that series.

The crucial issue, at least for purposes of determining the plaintiff's first aspect of the breach of contract claim, is whether the Ashton Ford series "compete[s] with the sale of" Harlequin's Mack Bolan series and its two spinoffs, within the meaning of paragraph 8 of the Agreement. It is clear that the parties did not reach a meeting of the minds as to the scope of these key terms. Harlequin's people claim that they knew that paragraph 8 would allow Pendleton to write in the future, but understood that his interest was limited to publishing inspirational, non-fiction works. Pendleton and his agent state that, while Pendleton had no immediate intentions of writing fiction of any sort, the provision was designed to allow him to write fiction under his own name in the future, providing that it did not "compete with the sale of the action-adventure series" to be published by Harlequin.[13]

Nevertheless, two parties can form a binding contract even though each attached a different meaning to its written terms, providing that each had no reason to suppose that his own meaning was not shared by the other party. 4 W. Jaeger, *Williston on Contracts* § 606, at 372 (3d ed. 1961). Moreover, the actual intent of the parties, if not clearly expressed in the written contract, is ineffective. *Williston on Contracts, supra,* § 610, at 500.

---

**12.** Federal jurisdiction is premised on diversity of citizenship. Harlequin is a Canadian corporation with its principal place of business in that country. The defendants are all United States citizens. *See* 28 U.S.C. § 1332(a)(2) (1982).

**13.** Scovil, who drafted the phrase in question, states that it must be "demonstrated" that the books compete. When it comes to explaining how one makes such a demonstration, he has little to offer.

The parties seem to agree that whether the Ashton Ford series "compete[s] with the sale of" the Gold Eagle series depends upon whether the Ashton Ford series causes the plaintiff to lose a material amount of income on the sales of its series. Unfortunately, the nature of the mass paperback market is such that it will be many months, and perhaps a year or more, before the sales figures for the Mack Bolan books published after "Ashes to Ashes" are known.[14] Moreover, these figures will not necessarily establish the impact of the defendants' book on the plaintiff's sales. Numerous factors affect the sales of each new volume of the series, including the timeliness of the book's subject and the attractiveness of its cover, see supra note 10.

Our inability to gauge actual market impact required pursuit of the question of competition through two other avenues. We examined whether the contents of the books appeal to similar readerships and whether the manner in which they are being promoted and marketed causes them to compete.[15]

The plaintiff contends that the books appeal to similar readerships as short, easy to read, men's adventure books with a dominant male hero who solves problems beyond the means of conventional law enforcement. In addition, the male hero in both books has a strong moral code and special skills. According to the plaintiff, the books meet the same appeal for male adventure and will compete in the marketplace.

Numerous experts in the publishing field, such as editors, writers, professors of literature, publishers, pollsters, as well as the individual defendants, addressed the question of reader appeal. Their testimony was contradictory and inconclusive. It revealed that for cataloguing fiction, there is nothing comparable to the Dewey Decimal System by which non-fiction is catalogued. Indeed, many libraries and some booksellers simply lump all fiction together, alphabetized by author. The categorization of a work on its spine is equally discretionary. Pinnacle classified the Mack Bolan series as both "action/adventure" and "adventure." The Gold Eagle series is categorized simply as "adventure." Warner uses the even less descriptive designation of "fiction" on "Ashes to Ashes."

One of Harlequin's witnesses, Mark Howell, who edited most of the Gold Eagle adventure series, testified that there are only two major branches of fiction—adventure and romance. Other witnesses saw numerous divisions and subdivisions. Most tended to agree that women are more attracted to fiction than men and that there was a distinct type of "male fiction." Witnesses, however, differed as to what constitutes "male fiction." Clearly, the Mack Bolan series is such, since about 82% of its readers are men. Whether the Ashton Ford books can be so considered was a matter of dispute. Warner is attempting to attract Mack Bolan's male readership while drawing non-Bolan readers, including a greater percentage of female readers.

Although unedifying in certain respects, the expert testimony, together with a close reading of works from the Bolan and Ashton Ford series, reveals that the two will appeal to distinctly dissimilar audiences. Numerous imitators have made "The Executioner" series a distinct genre of "action

14. Paperbacks are distributed through various outlets to a number of distributors. Because initial shipments are substantial, reorders are unnecessary, at least for a prolonged period. Distributors receive credit for returns by tearing off the front cover and sending it back to Harlequin. The final calculations of returns is, therefore, not made for a prolonged period.

15. There were additional considerations. For example, the defendants argued that Ashton Ford readers who had not previously read any Mack Bolan books might be prompted to buy the books in that series. Conversely, the plaintiff argued that fans of Mack Bolan who were attracted to Don Pendleton's series might be so disappointed as to lose their allegiance to the Mack Bolan series. Neither of these contentions was proven at trial.

adventure." Although elements of that genre appear in detective books (such as Mickey Spillane's "Mike Hammer") and spy/adventure books (such as Ian Fleming's "James Bond"), the genre is quite distinct when adapted to a para-military hero such as Mack Bolan.

The three Ashton Ford books are less easily categorized. As mentioned earlier, certain elements of the writing style are reminiscent of the hardboiled detective styles and, of course, Pendleton's writing style is apparent. Nevertheless, Ashton Ford's parapsychological talents, his involvement in supernatural events, the absence of extreme violence, and the presence of explicit sex, distinguish the two series from the standpoint of reader appeal. This is not to say that fans of Don Pendleton will not be tempted to read "Ashes to Ashes." A telephone survey of regular Mack Bolan subscribers indicated that most would probably try the book because Pendleton is the author. Some may even enjoy it and buy additional books in the series. This Court concludes, however, that the majority of Mack Bolan fans will not find Ashton Ford to be their sort of hero.

Whether Warner's promotional strategy causes the Ashton Ford series to compete with the Mack Bolan series is a more difficult issue. Warner's initial promotional materials for "Ashes to Ashes," both the book's cover and the industry brochures, unnecessarily traded upon Mack Bolan and "The Executioner" series. However, neither Pendleton nor his agent had any control over this, and Warner, at that time, was unaware of the contract's provisions. Since Harlequin's lawyers intervened, Warner has shifted its emphasis to the psychic and away from the action-adventure aspects of the series. The emphasis in the next two Ashton Ford books is even more on the supernatural. There is now little danger that Warner's current or future

promotional strategy will promote competition between the two series.

Harlequin argues that since all defendants are now on notice of the problems of competing under the contract, future promotion of books in the Ashton Ford series should be controlled. This, in fact, has already occurred. Harlequin, nevertheless, urges us, at a minimum, to enjoin any future unfair competition. However, issuance of a blanket injunction against violations that have not and may never occur would be inappropriate. Future violations of the agreement will have to be the subject of a new action. Thus, injunctive relief is unwarranted with respect to Pendleton's writing or Warner's past or future promotion of the Ashton Ford series.

Of course, regardless of the content of the Ashton Ford series or how it is promoted, the two series may appear in close proximity in the bookstores. Indeed, bookstores that alphabetize all fiction by author have exhibited Pendleton's "Ashes to Ashes" next to the Mack Bolan books, since only Pendleton's name appears on their cover. Even some of the large bookstores (40 percent of the Bolan books are sold in bookstores), lump fiction under a few limited headings, such as "adventure" or "mystery," so that the two series may often be in close proximity. Likewise, newsstands that sell fiction make little attempt to segregate types of books. The net effect is that the Bolan and Ashton Ford series might be somewhat competitive simply because they are sold in close proximity as paperback fiction.

The construction of paragraph 8 urged by the plaintiff that would forbid such bookstore and newsstand competition, a matter beyond the publisher's control, would effectively prevent Pendleton from writing any new fiction, even of a different sort. The applicable Ontario law[16] mandates a narrower construction of the par-

**16.** The May 15, 1980 Agreement provided that the law of Ontario would govern its construc-

tion and interpretation.

ties' obligations. Even the plaintiff's expert on Ontario law acknowledges that covenants in restraint of trade are *prima facie* void as contrary to the public policy. Such covenants are enforced only if reasonable in reference to the interests of the parties and of the public. The burden of showing the reasonableness of the restraint rests with the party seeking to enforce the covenant, here Harlequin.

■ To prevent Pendleton from writing any new fiction, even of a different sort, simply because it could conceivably indirectly effect sales of "The Executioner" series, is to carry the restrictions of the contract to excess.[17] Both the Ontario rule of construction and the public's interest in benefitting from Pendleton's creations argue for a narrow construction of the term "compete" that would permit the speculative form of newsstand competition noted above. Because the subject matter of the Ashton Ford and the Mack Bolan series are so different, the two series do not "compete with the sale[s] of" each other, narrowly construed as those terms must be. Harlequin bought Pendleton's characters—it did not buy his writing abilities.

■ The second aspect of the breach of contract claim is easily disposed of. The plaintiff asserts that Pendleton violated paragraph 6 of the agreement by listing himself as author of the new series. The plaintiff notes correctly that paragraph 6, which, in relevant part, prevents Pendleton from associating with a competitor, or permitting his name to be used in a manner that would compete with the Mack Bolan series, is broader than paragraph 8. Para-

graph 6 covers many acts beside the writing of books. However, with respect to writing books, paragraph 8 completely supplants paragraph 6, starting as it does with the language "notwithstanding anything in the paragraphs 6 and 7 hereof, Pendleton reserves the right to create and/or write works for others...." Since paragraph 8 permits Pendleton to write other books, and does not restrict him from designating himself as the author, he is well within his rights in accepting a byline for the Ashton Ford series.

■ The propriety of the reference to Pendleton on the cover of the Ashton Ford books as the creator of "The Executioner" series is a closer question. The evidence at trial established that such references to an author's prior works are common. If Harlequin was agreeable to Pendleton writing other books, but wished to prevent those books from referring to Pendleton's earlier writings, it should have incorporated that restriction in the contract. Consequently, the reference to Pendleton's earlier works does not *per se* violate the contract.

■ The parties agree that New York law governs the plaintiff's claim against Warner for tortious interference with contract.[18] Harlequin cannot state a claim against Warner for tortiously interfering with Harlequin's contract with Pendleton, unless Pendleton breached that contract. *Jack L. Inselman & Co. v. FNB Financial Co.*, 41 N.Y.2d 1078, 1080, 364 N.E.2d 1119, 396 N.Y.S.2d 347 (1977), *citing Israel v. Wood Dolson Co.*, 1 N.Y.S.2d 116, 120, 134 N.E.2d 97, 151 N.Y.S.2d 1 (1956); 32 N.Y. Jur., Interference § 20 (1963). Our conclu-

---

17. An additional consideration is that Harlequin has had the exclusive use of Pendleton's characters and services for more than six years. They have published about fifty five Mack Bolan books. The unlimited duration of the noncompete provision makes its continued extension questionable. *See Investors Syndicate Limited v. Versatile Investments Limited,* 126 D.L.R.3d 451, 463 (1981).

18. Under New York law, the law of the state with the most substantial interest in the controversy applies. *Perdue v. J.C. Penney Co.,* 470 F.Supp. 1234, 1237 (S.D.N.Y.1979); *Neumeier v. Kuehner,* 31 N.Y.2d 121, 127, 286 N.E.2d 454, 335 N.Y.S.2d 64 (1972). Because much of the conduct alleged to constitute tortious interference occurred within New York, and because Warner is located in New York, New York law governs the plaintiff's claims for tortious interference.

sion that Pendleton did not breach his contract thus disposes of this claim.

## CHAPTER 4

### DON PENDLETON'S "MACK BOLAN"

■ Pendleton counterclaims under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1982), which prohibits, among other things, false descriptions or representations. An incorrect designation of authorship on the cover of a book is a violation of that Act. *Follett v. Arbor House,* 497 F.Supp. 304 (S.D.N.Y.1980).

Pendleton asserts that the continued use of his name on the Harlequin covers, combined with the absence of any other mentioned author, leads many readers to assume incorrectly that he continues to author the Mack Bolan books. Pendleton seeks to enjoin any further use of his name by Harlequin.

Pendleton acknowledges agreeing to the current cover attribution but states that he believed that Harlequin would adopt a house pseudonym for the various writers who actually write the series. Although Pendleton has known for years that Harlequin has not adopted a pseudonym, only now does he raise this issue in response to the plaintiff's claim that he cannot use his own name on works that he is currently writing.

■ Pendleton, who has previously acquiesced to the current description, continues to benefit at the rate of $200,000 a year from the sale of Harlequin books. While he may not have been guilty of an "unconscionable act," *see Market v. Scovill Manufacturing Co.,* 471 F.Supp. 1244, 1255 (W.D.N.Y.1979), he has been responsible for the repeated usage of his name over the years. Under the circumstances, he does not have the clean hands required of someone seeking such equitable relief.

■ Although the present attribution is somewhat misleading, it is not technically inaccurate. Don Pendleton did create Mack Bolan. Moreover, the suggested alternative, the use of a house pseudonym, is at least as misleading to the general reading public. The requested relief must, therefore, be denied and the counterclaim dismissed.

## EPILOGUE

Don Pendleton's "Ashton Ford" series does not "compete with the sale" of the plaintiff's "Mack Bolan" series within the meaning of the May 15, 1980 contract as construed in accordance with Ontario law. The promotion and sale of the two most recent Ashton Ford books does not "compete with the sale" of the "Mack Bolan" series within the meaning of the contract. The defendant publisher, Warner Books, Inc., did not interfere with the Harlequin-Pendleton contract in its initial promotion of "Ashes to Ashes," since Warner was unaware of the contract's provisions and since Pendleton did not breach the contract. Defendant Scott Meredith Literary Agency did not interfere by virtue of that promotion since it had absolutely nothing to do with it. Don Pendleton is not entitled to any relief with respect to the current usage of his name on the "Mack Bolan" covers. Neither side is entitled to the injunctive relief sought. The complaint and the counterclaim are dismissed. The Clerk will enter judgment accordingly.

SO ORDERED.