**RANDOM HOUSE, INC., Plaintiff,**

v.

**ROSETTA BOOKS LLC and Arthur M. Klebanoff, in his individual capacity and as principal of Rosetta Books LLC, Defendants.**

**No. 01 CIV. 1728(SHS).**

United States District Court,
S.D. New York.

July 11, 2001.

*OPINION*

STEIN, District Judge.

In this copyright infringement action, Random House, Inc. seeks to enjoin Rosetta Books LLC and its Chief Executive Officer from selling in digital format eight specific works on the grounds that the authors of the works had previously granted Random House—not Rosetta Books— the right to "print, publish and sell the work[s] in book form." Rosetta Books, on the other hand, claims it is not infringing upon the rights those authors gave Random House because the licensing agreements between the publisher and the author do not include a grant of digital or electronic rights.[1] Relying on the language of the contracts and basic principles of contract interpretation, this Court finds that the right to "print, publish and sell the work[s] in book form" in the contracts at issue does not include the right to publish the works in the format that has come to be known as the "ebook." Accordingly, Random House's motion for a preliminary injunction is denied.

BACKGROUND

In the year 2000 and the beginning of 2001, Rosetta Books contracted with several authors to publish certain of their works—including *The Confessions of Nat Turner* and *Sophie's Choice* by William Styron; *Slaughterhouse–Five, Breakfast of Champions, The Sirens of Titan, Cat's Cradle,* and *Player Piano* by Kurt Vonnegut; and *Promised Land* by Robert B. Parker—in digital format over the internet. (Def. Ex. 21–23; http://www.rosettabooks.com/pages/about_us.html.) On February 26, 2001 Rosetta Books launched its ebook business, offering those titles and others for sale in digital format. (Cantos Aff. ¶ 2, Ex. A; http://www.rosettabooks.com). The next day, Random House filed this complaint accusing Rosetta Books of committing copyright infringement and tortiously interfering with the contracts Random House had with Messrs. Parker, Styron and Vonnegut by selling its ebooks. It simultaneously moved for a preliminary injunction prohibiting Rosetta from infringing plaintiff's copyrights.

**A. Ebooks**

Ebooks are "digital book[s] that you can read on a computer screen or an electronic

---

1. The Authors Guild, Inc., the Association of Authors' Representatives, Inc., Penguin Putnam Inc., Simon and Schuster, Inc., Time Warner Trade Publishing Inc., and the Perseus Books Group have appeared as amici curiae.

device." (Hrg. at 13;[2] http://www.rosetta-books.com/pages/about_ebooks.html) Ebooks are created by converting digitized text into a format readable by computer software. The text can be viewed on a desktop or laptop computer, personal digital assistant or handheld dedicated ebook reading device. (Van Dam Decl. ¶ 9.) Rosetta's ebooks can only be read after they are downloaded into a computer that contains either Microsoft Reader, Adobe Acrobat Reader, or Adobe Acrobat eBook Reader software. (Dwyer Decl. ¶ 11; Hrg. at 15.)

Included in a Rosetta ebook is a book cover, title page, copyright page and "eforward" all created by Rosetta Books. Although the text of the ebook is exactly the same as the text of the original work, the ebook contains various features that take advantage of its digital format. For example, ebook users can search the work electronically to find specific words and phrases. They can electronically "highlight"[3] and "bookmark"[4] certain text, which can then be automatically indexed and accessed through hyperlinks. They can use hyperlinks in the table of contents to jump to specific chapters.

Users can also type electronic notes which are stored with the related text. These notes can be automatically indexed, sorted and filed. Users can also change the font size and style of the text to accommodate personal preferences; thus, an electronic screen of text may contain more words, fewer words, or the same number of words as a page of the original published book. In addition, users can have displayed the definition of any word in the text. (Dwyer Decl. ¶¶ 6(g), 7.) In one version of the software, the word can also be pronounced aloud.[5] (Dwyer Decl. ¶ 7.)

Rosetta's ebooks contain certain security features to prevent users from printing, emailing or otherwise distributing the text. Although it is technologically possible to foil these security features, anyone who does so would be violating the licensing agreement accompanying the software. (Hrg. at 12; Dwyer Decl. ¶ 7.)

### B. Random House's licensing agreements

While each agreement between the author and Random House differs in some respects, each uses the phrase "print, publish and sell the work in book form" to convey rights from the author to the publisher. (Sarnoff Aff. Ex. A ¶ 1(a)(i), Ex. B, ¶ 1(a)(i), Ex. C ¶ 1(a), Ex. D ¶ 1(a), Ex. E ¶ 1(a).)

### 1. Styron Agreements

Forty years ago, in 1961, William Styron granted Random House the right to publish *The Confessions of Nat Turner*. Besides granting Random House an exclusive license to "print, publish and sell the work in book form," Styron also gave it the right to "license publication of the work by book clubs," "license publication of a reprint edition," "license after book publication the

---

**2.** References to "Hrg. at __" are to the pages of the transcript of the evidentiary hearing and oral argument of Random House's motion for a preliminary injunction held on May 8, 2001.

**3.** "Highlighting" is marking passages of digital text in a transparent color with the use of an electronic stylus. (Hrg. at 21.)

**4.** "Bookmarking" is flagging a portion of electronic text which enables a user to jump directly to that text at a later point in time. (Hrg. at 22.)

**5.** Ebooks themselves are in the process of evolving. In development is the ability to incorporate within the ebook audio, graphics, full-motion video, and internet hyperlinks related to the electronic text. (Dwyer Decl. ¶ 10.)

publication of the work, in whole or in part, in anthologies, school books," and other shortened forms, "license without charge publication of the work in Braille, or photographing, recording, and micro-filming the work for the physically handicapped," and "publish or permit others to publish or broadcast by radio or television ... selections from the work, for publicity purposes ...." (Sarnoff Aff. Ex. A ¶ 1(a)(ii)-(vi).) Styron demonstrated that he was not granting Random House the rights to license publication in the British Commonwealth or in foreign languages by crossing out these clauses on the form contract supplied by Random House. (*Id.* ¶ 1(b), (c); Hrg. at 44; Def. Mem. at 8.)

The publisher agreed in the contract to "publish the work at its own expense and in such style and manner and at such a price as it deems suitable." (Sarnoff Aff. Ex. A ¶ 2.) The contract also contains a non-compete clause that provides, in relevant part, that "[t]he Author agrees that during the term of this agreement he will not, without the written permission of the Publisher, publish or permit to be published any material in book or pamphlet form, based on the material in the work, or which is reasonably likely to injure its sale." (*Id.* at ¶ 8.) Styron's contract with Random House for the right to publish *Sophie's Choice*, executed in 1977, is virtually identical to his 1961 contract to publish *The Confessions of Nat Turner.* (Sarnoff Aff. Ex. B.)

### 2. Vonnegut Agreements

Kurt Vonnegut's 1967 contract granting Random House's predecessor-in-interest Dell Publishing Co., Inc. the license to publish *Slaughterhouse–Five* and *Breakfast of Champions* follows a similar structure to the Styron agreements. Paragraph # 1 is captioned "grant of rights" and contains those rights the author is

granting to the book publisher. Certain rights on the publisher's form contract are crossed out, indicating that the author reserved them for himself. (Sarnoff Aff. Ex C, ¶ 1(b), (e); Hrg. at 44; Def. Mem. at 10.) One of the rights granted by the author includes the "[e]xclusive right to publish and to license the Work for publication, after book publication ... in anthologies, selections, digests, abridgements, magazine condensations, serialization, newspaper syndication, picture book versions, microfilming, Xerox and other forms of copying, either now in use or hereafter developed." (Sarnoff.Aff.Ex. C. ¶ 1(d).)

Vonnegut specifically reserved for himself the "dramatic ... motion picture (silent and sound) ... radio broadcasting (including mechanical renditions and/or recordings of the text) ... [and] television" rights. (Sarnoff Aff. Ex. C ¶ 5.) Unlike the Styron agreements, this contract does not contain a non-compete clause.

Vonnegut's 1970 contract granting Dell the license to publish *The Sirens of Titan, Cat's Cradle,* and *Player Piano* contains virtually identical grants and reservations of rights as his 1967 contract. However, it does contain a non-compete clause, which provides that "the Author ... will not publish or permit to be published any edition, adaptation or abridgment of the Work by any party other than Dell without Dell's prior written consent." (Sarnoff Aff. Ex. D ¶ 10(e).)

### 3. Parker Agreement

Robert B. Parker's 1982 contract granting Dell the license to publish *Promised Land* is similar to the 1970 Vonnegut contract. (Sarnoff Aff. Ex. E ¶ 1; Hrg. at 44; Def. Mem. at 12.) Paragraph # 1 contains the "grant of rights," certain of which have been crossed out by the author. The contract does grant Random House the right

to "Xerox and other forms of copying of the printed page, either now in use or hereafter developed." (Sarnoff Aff. Ex. E ¶ 1(d).) Parker also reserved the rights to the "dramatic ... motion picture (silent and sound) ... radio broadcasting ... television ... mechanical or electronic recordings of the text ...." (Sarnoff. Aff. Ex. E ¶ 5.) There is also a non-compete clause that provides, in relevant part, that "[t]he Author ... will not, without the written permission of Dell, publish or permit to be published any material based on the material in the Work, or which is reasonably likely to injure its sale." (Sarnoff Aff. Ex. E ¶ 18.)

DISCUSSION

### A. Preliminary Injunction Standard for Copyright Infringement

Random House seeks a preliminary injunction against Rosetta Book's alleged infringing activity pursuant to 17 U.S.C. § 502(a) of the Copyright Act. In order to obtain a preliminary injunction, Random House must demonstrate "(1) irreparable harm and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions about the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting relief." *ABKCO Music, Inc. v. Stellar Records, Inc.*, 96 F.3d 60, 64 (2d Cir.1996); *see also Consumers Union of U.S., Inc. v. General Signal Corp.*, 724 F.2d 1044, 1048 (2d Cir. 1983); *Tienshan, Inc. v. C.C.A Int'l Inc.*, 895 F.Supp. 651, 655 (S.D.N.Y.1995). In addition, if the moving party establishes a prima facie case of copyright infringement, then a presumption of irreparable harm arises. *See ABKCO Music*, 96 F.3d at 64; *Wainwright Sec., Inc. v. Wall Street Transcript Corp.*, 558 F.2d 91, 94 (2d Cir.1977); *Dynamic Solutions, Inc. v. Planning & Control, Inc.*, 646 F.Supp. 1329, 1337 (S.D.N.Y.1986).

### B. Ownership of a Valid Copyright

Two elements must be proven in order to establish a prima facie case of infringement: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991); *see also ABKCO Music*, 96 F.3d at 64; *Tienshan*, 895 F.Supp. at 655. In this case, only the first element—ownership of a valid copyright—is at issue, since all parties concede that the text of the ebook is identical to the text of the book published by Random House.

It is well settled that although the authors own the copyrights to their works, "[t]he legal or beneficial owner of an exclusive right under a copyright is entitled ... to institute an action for any infringement of that particular right committed while he or she is the owner of it." 17 U.S.C. § 501(b); *see also Essex Music, Inc. v. ABKCO Music & Records, Inc.*, 743 F.Supp. 237, 241 (S.D.N.Y.1990) ("Plaintiff as an exclusive licensee has the right to institute an action for copyright infringement."); Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 12.02[b] at 12–50–51 (May, 2000) ("[A]n exclusive licensee may not sue for infringement of rights as to which he is not licensed, even if the subject matter of the infringement is the work as to which he is a licensee."). The question for resolution, therefore, is whether Random House is the beneficial owner of the right to publish these works as ebooks.

### 1. Contract Interpretation of Licensing Agreements—Legal Standards

■ Random House claims to own the rights in question through its licensing agreements with the authors. Interpreta-

tion of an agreement purporting to grant a copyright license is a matter of state contract law. *See Flack v. Friends of Queen Catherine Inc.*, 139 F.Supp.2d. 526, 536 (S.D.N.Y.2001); *see also Boosey & Hawkes Music Publishers, Ltd. v. Walt Disney Co.*, 145 F.3d 481, 487 (2d Cir.1998); *Bourne v. Walt Disney Co.*, 68 F.3d 621, 628–29 (2d Cir.1995); *Video Trip Corp. v. Lightning Video, Inc.*, 866 F.2d 50, 52 (2d Cir.1989) ("[T]he real question presented was whether the claimant had ownership which could only be resolved by determining the contractual obligations of the parties. Neither substantive nor procedural copyright law was involved in the resolution of the dispute."); *Bartsch v. Metro-Goldwyn-Mayer, Inc.*, 391 F.2d 150, 153 (2d Cir. 1968); *Bloom v. Hearst Entm't, Inc.*, 33 F.3d 518, 522 (5th Cir.1994). All of the agreements state that they "shall be interpreted according to the law of the State of New York." (Sarnoff Aff. Ex. A ¶ 21, Ex. B ¶ 22; Sarnoff Aff. Ex. C ¶ 16, Ex. D ¶ 16, Ex. E ¶ 16 ("in accordance with the laws of the State of New York").)

In New York, a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the contract's language. *See Terwilliger v. Terwilliger*, 206 F.3d 240, 245 (2d. Cir. 2000) (citing *Breed v. Insurance Co. of N. Am.*, 46 N.Y.2d 351, 355, 385 N.E.2d 1280, 1283, 413 N.Y.S.2d 352, 355 (1978)). The court must consider the entire contract and reconcile all parts, if possible, to avoid an inconsistency. *See Terwilliger*, 206 F.3d at 245; *Laba v. Carey*, 29 N.Y.2d 302, 308, 277 N.E.2d 641, 644, 327 N.Y.S.2d 613, 618 (1971).

■ Determining whether a contract provision is ambiguous is a question of law to be decided by the court. *See Morse/Diesel, Inc. v. Trinity Indus., Inc.*, 67 F.3d 435, 443 (2d Cir.1995); *W.W.W. Assocs., Inc. v. Frank Giancontieri*, 77 N.Y.2d 157, 162, 566 N.E.2d 639, 642, 565 N.Y.S.2d 440, 443 (1990). Pursuant to New York law, "[c]ontract language is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Sayers*, 7 F.3d at 1095 (internal quotations and citation omitted); *see also Bloom*, 33 F.3d at 522 (citing N.Y.U.C.C. § 2–202, Official Comment 1). "No ambiguity exists when contract language has a 'definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.' " *Sayers*, 7 F.3d at 1095 (quoting *Breed*, 46 N.Y.2d at 355, 385 N.E.2d at 1283, 413 N.Y.S.2d at 355).

■ If the language of a contract is ambiguous, interpretation of the contract becomes a question of fact for the finder of fact and extrinsic evidence is admissible. *See Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir.1992); *Raine v. CBS Inc.*, 25 F.Supp.2d 434, 444 (S.D.N.Y.1998); *Hartford Accident & Indem. Co. v. Wesolowski*, 33 N.Y.2d 169, 172, 305 N.E.2d 907, 909, 350 N.Y.S.2d 895, 898 (1973).

These principles are in accord with the approach the U.S. Court of Appeals for the Second Circuit uses in analyzing contractual language in disputes, such as this one, "about whether licensees may exploit licensed works through new marketing channels made possible by technologies developed after the licensing contract—often called 'new use' problems." *Boosey & Hawkes Music Publishers, Ltd. v. Walt Disney Co.*, 145 F.3d 481, 486 (2d Cir. 1998). The two leading cases in this Cir-

cuit on how to determine whether "new uses" come within prior grants of rights are *Boosey* and *Bartsch v. Metro–Goldwyn–Mayer, Inc.,* 391 F.2d 150 (2d Cir.1968), decided three decades apart.

In *Bartsch,* the author of the play "Maytime" granted Hans Bartsch in 1930 "the motion picture rights [to 'Maytime'] throughout the world," including the right to "copyright, vend, license and exhibit such motion picture photoplays throughout the world; together with the further sole and exclusive rights by mechanical and/or electrical means to record, reproduce and transmit sound, including spoken words...." 391 F.2d at 150. He in turn assigned those rights to Warner Bros. Pictures, which transferred them to MGM. In 1958 MGM licensed its motion picture "Maytime" for viewing on television. Bartsch sued, claiming the right to transmit the play over television had not been given to MGM.

■ Judge Henry Friendly, for the Second Circuit, wrote in 1968 that "any effort to reconstruct what the parties actually intended nearly forty years ago is doomed to failure." *Id.* at 155. He added that the words of the grant by Bartsch "were well designed to give the assignee [i.e., MGM] the broadest rights with respect to its copyrighted property." *Id.* at 154. The words of the grant were broad enough to cover the new use—i.e. viewing on television—and Judge Friendly interpreted them to do so. This interpretation, he wrote, permitted the licensee to "properly pursue any uses which may reasonably be said to fall within the medium as described in the license." *Id.* at 155. That interpretation also avoided the risk "that a deadlock between the grantor and the grantee might prevent the work's being shown over the new medium at all." *Id.*

In *Boosey,* the plaintiff was the assignee of Igor Stravinsky's copyrights in the mu-

sical composition, "The Rite of Spring." In 1939, Stravinsky had licensed Disney's use of "The Rite of Spring" in the motion picture "Fantasia." Fifty-two years later, in 1991, Disney released "Fantasia" in video format and Boosey brought an action seeking, among other relief, a declaration that the grant of rights did not include the right to use the Stravinsky work in video format. In *Boosey,* just as in *Bartsch,* the language of the grant was broad, enabling the licensee "to record in any manner, medium or form, and to license the performance of, the musical composition [for use] in a motion picture." 145 F.3d at 484.

At the Second Circuit, a unanimous panel focused on "neutral principles of contract interpretation rather than solicitude for either party." *Id.* at 487. "What governs," Judge Pierre Leval wrote, "is the language of the contract. If the contract is more reasonably read to convey one meaning, the party benefitted by that reading should be able to rely on it; the party seeking exception or deviation from the meaning reasonably conveyed by the words of the contract should bear the burden of negotiating for language that would express the limitation or deviation. This principle favors neither licensors nor licensees. It follows simply from the words of the contract." *Id.*

The Second Circuit's neutral approach was specifically influenced by policy considerations on both sides. On the one hand, the approach seeks to encourage licensees—here, the publishers—to develop new technologies that will enable all to enjoy the creative work in a new way. On the other hand, it seeks to fulfill the purpose underlying federal copyright law—to encourage authors to create literary works. *See Boosey,* 145 F.3d at 487, 488 n. 4.

## 2. Application of Legal Standards

■ Relying on "the language of the license contract and basic principles of interpretation," *Boosey,* 145 F.3d at 487 n. 3, as instructed to do so by *Boosey* and *Bartsch,* this Court finds that the most reasonable interpretation of the grant in the contracts at issue to "print, publish and sell the work in book form" does not include the right to publish the work as an ebook. At the outset, the phrase itself distinguishes between the pure content— i.e. "the work"—and the format of display—"in book form." The *Random House Webster's Unabridged Dictionary* defines a "book" as "a written or printed work of fiction or nonfiction, usually on sheets of paper fastened or bound together within covers" and defines "form" as "external appearance of a clearly defined area, as distinguished from color or material; the shape of a thing or person." *Random House Webster's Unabridged Dictionary* (2001), available in searchable form at http://www.allwords.com.

Manifestly, paragraph # 1 of each contract—entitled either "grant of rights" or "exclusive publication right"—conveys certain rights from the author to the publisher. (Sarnoff Aff. Ex. A ¶ 1, Ex. B, ¶ 1, Ex. C ¶ 1, Ex. D ¶ 1, Ex. E ¶ 1.) In that paragraph, separate grant language is used to convey the rights to publish book club editions, reprint editions, abridged forms, and editions in Braille. This language would not be necessary if the phrase "in book form" encompassed all types of books. That paragraph specifies exactly which rights were being granted by the author to the publisher. Indeed, many of the rights set forth in the publisher's form contracts were in fact not granted to the publisher, but rather were reserved by the authors to themselves. For example, each of the authors specifically reserved certain rights for themselves by striking out phrases, sentences, and paragraphs of the publisher's form contract. This evidences an intent by these authors not to grant the publisher the broadest rights in their works.

Random House contends that the phrase "in book form" means to faithfully reproduce the author's text in its complete form as a reading experience and that, since ebooks concededly contain the complete text of the work, Rosetta cannot also possess those rights. (Hrg. at 39; Green Aff. ¶ 5; Miller Aff. ¶ 15.) While Random House's definition distinguishes "book form" from other formats that require separate contractual language—such as audio books and serialization rights—it does not distinguish other formats specifically mentioned in paragraph # 1 of the contracts, such as book club editions and reprint editions. Because the Court must, if possible, give effect to all contractual language in order to "safeguard against adopting an interpretation that would render any individual provision superfluous," *Sayers,* 7 F.3d at 1095, Random House's definition cannot be adopted.

Random House points specifically to the clause requiring it to "publish the work at its own expense and in such a style and manner and at such a price as [Random House] deems suitable" as support for its position. (Sarnoff Aff. Ex. A ¶ 2.) However, plaintiff takes this clause out of context. It appears in paragraph # 2, captioned "Style, Price and Date of Publication," not paragraph # 1, which includes all the grants of rights. In context, the phrase simply means that Random House has control over the appearance of the formats granted to Random House in the first paragraph; i.e., control over the style of the book.

Random House also cites the non-compete clauses as evidence that the authors granted it broad, exclusive rights in their

work. Random House reasons that because the authors could not permit any material that would injure the sale of the work to be published without Random House's consent, the authors must have granted the right to publish ebooks to Random House. This reasoning turns the analysis on its head. First, the grant of rights follows from the grant language alone. *See Boosey*, 145 F.3d at 488. Second, non-compete clauses must be limited in scope in order to be enforceable in New York. *See American Broad. Cos. v. Wolf,* 52 N.Y.2d 394, 403–04, 420 N.E.2d 363, 367–68, 438 N.Y.S.2d 482, 486–87 (1981); *Columbia Ribbon & Carbon Mfg. Co., Inc. v. A–1–A Corp.,* 42 N.Y.2d 496, 500, 369 N.E.2d 4, 6, 398 N.Y.S.2d 1004, 1007 (1977). Third, even if the authors did violate this provision of their Random House agreements by contracting with Rosetta Books—a point on which this Court does not opine—the remedy is a breach of contract action against the authors, not a copyright infringement action against Rosetta Books. *See, e.g., Harlequin Enter. Ltd. v. Warner Books, Inc.,* 639 F.Supp. 1081 (S.D.N.Y.1986).

The photocopy clause—giving Random House the right to "Xerox and other forms of copying, either now in use or hereafter developed"—similarly does not bolster Random House's position. Although the clause does appear in the grant language

paragraph, taken in context, it clearly refers only to new developments in xerography and other forms of photocopying. Stretching it to include new forms of publishing, such as ebooks, would make the rest of the contract superfluous because there would be no reason for authors to reserve rights to forms of publishing "now in use." This interpretation also comports with the publishing industry's trade usage of the phrase. *See, e.g.* (Fowler Decl. ¶¶ 12, 20, Congdon Decl. ¶ 27, Borchardt Decl. ¶ 23).[6]

Not only does the language of the contract itself lead almost ineluctably to the conclusion that Random House does not own the right to publish the works as ebooks, but also a reasonable person "cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business," *Sayers*, 7 F.3d at 1095, would conclude that the grant language does not include ebooks.[7] "To print, publish and sell the work in book form" is understood in the publishing industry to be a "limited" grant. *See Field v. True Comics,* 89 F.Supp. 611, 613–14 (S.D.N.Y.1950); *see also* Melville B. Nimmer & David Nimmer, *Nimmer on Copyright,* § 10.14[C] (2001) (citing *Field*).

In *Field v. True Comics,* the court held that "the sole and exclusive right to publish, print and market *in book form*"—

---

**6.** Similarly, Rosetta's argument that the contractual clause in which the authors reserve motion picture and broadcasting rights for themselves in certain contracts also means that the authors reserved the ebook rights is without merit. Such reservation clauses, unless they expressly cover the new use in question, "contribute[ ] nothing to the definition of the boundaries of the license." *See Boosey*, 145 F.3d at 488.

**7.** Although *Boosey* recognizes that extrinsic evidence of industry custom is not likely to be helpful in analyzing the intent of the parties, it does not prohibit considering trade usage in

understanding specific terms of the contract. *See id.* at 488, 489 (acknowledging that evidence of industry custom will not likely illuminate the intent of the parties, but nonetheless taking into account industry custom in interpreting the meaning of a specific clause).

Even were this Court to find the contracts ambiguous, thus allowing consideration of extrinsic evidence other than trade usage to determine whether Random House has a likelihood of success on the merits, a review of that evidence leads to the conclusion that it is unhelpful to either party.

especially when the author had specifically reserved rights for himself—was "much more limited" than "the sole and exclusive right to publish, print and market *the book.*" 89 F.Supp. at 612 (emphasis added). In fact, the publishing industry generally interprets the phrase "in book form" as granting the publisher "the exclusive right to publish a hardcover trade book in English for distribution in North America." 1 *Lindey on Entertainment, Publishing and the Arts* Form 1.01–1 (2d ed.2000) (using the Random House form contract to explain the meaning of each clause); *see also* Borchardt Decl. ¶¶ 9–13, Brann Decl. ¶¶ 5–9, Congdon Decl. ¶¶ 9–17, Donald Farber Decl. ¶¶ 7–17, Fowler Decl. ¶¶ 10, 20–24, Friedman Decl. ¶ 7, Levine Decl. ¶¶ 9–14, Maass Decl. ¶¶ 8–14. *But see* Klebanoff Dep. at 153–54 (acknowledging that the phrase, on its own, outside the context of a specific contract may include other forms of books such as book club editions, large print editions, leather bound editions, trade and mass market paperbacks); Levine Dep. at 37–38; Bloom Decl. Ex. K.

### 3. Comparison to Prior "New Use" Caselaw

The finding that the five licensing agreements at issue do not convey the right to publish the works as ebooks accords with Second Circuit and New York case law. Indeed, the two leading cases limned above that found that a particular new use was included within the grant language—*Boosey*, 145 F.3d 481 (2d Cir.1998), and *Bartsch*, 391 F.2d 150 (2d Cir.1968)—can be distinguished from this case on four grounds.

First, the language conveying the rights in *Boosey* and *Bartsch* was far broader than here. *See Boosey*, 145 F.3d at 486; *Bartsch*, 391 F.2d at 153. Second, the "new use" in those cases—i.e. display of a

motion picture on television or videocassette—fell squarely within the same medium as the original grant. *See Boosey*, 145 F.3d at 486 (describing videocassettes and laser discs as "subsequently developed methods of distribution of a motion picture"); *Bourne*, 68 F.3d at 630 ("[T]he term 'motion picture' reasonably can be understood to refer to 'a broad genus whose fundamental characteristic is a series of related images that impart an impression of motion when shown in succession .... Under this concept the physical form in which the motion picture is fixed—film, tape, discs, and so forth—is irrelevant.'") (quoting S.Rep. No. 92–72, at 5 (1971), U.S.Code Cong. & Admin.News 1971, pp. 1566, 1571); *see also Bloom*, 33 F.3d at 523.

In this case, the "new use"—electronic digital signals sent over the internet—is a separate medium from the original use—printed words on paper. Random House's own expert concludes that the media are distinct because information stored digitally can be manipulated in ways that analog information cannot. (Van Dam Dep. at 29–30, 36, 42.) Ebooks take advantage of the digital medium's ability to manipulate data by allowing ebook users to electronically search the text for specific words and phrases, change the font size and style, type notes into the text and electronically organize them, highlight and bookmark, hyperlink to specific parts of the text, and, in the future, to other sites on related topics as well, and access a dictionary that pronounces words in the ebook aloud. The need for a software program to interact with the data in order to make it usable, as well as the need for a piece of hardware to enable the reader to view the text, also distinguishes analog formats from digital formats. *See Greenberg v. National Geographic Soc'y*, 244 F.3d 1267, 1273 n. 12 (11th Cir.2001) (Digital format is not analogous to reproducing the magazine in mi-

crofilm or microfiche because it "requires the interaction of a computer program in order to accomplish the useful reproduction involved with the new medium.").

Therefore, *Boosey* and *Bartsch,* which apply to new uses within the same medium, do not control this case. *See, e.g., Raine,* 25 F.Supp.2d 434, 445 (S.D.N.Y. 1998) (finding that the right to "television broadcasts" did not include broadcasts on cable television or videocassettes); *General Mills, Inc. v. Filmtel Int'l Corp.,* 195 A.D.2d 251, 252, 599 N.Y.S.2d 820, 821–22 (1st Dep't 1993); *Tele–Pac, Inc. v. Grainger,* 168 A.D.2d 11, 570 N.Y.S.2d 521 (1st Dep't 1991) (distinguishing Second Circuit "new use" doctrine by holding that right to "broadcast[ ] by television or any other similar device now known or hereafter to be made known" was so dissimilar from display on videocassette and videodisc "as to preclude consideration of video rights as even falling within the 'ambiguous penumbra' of the terms used in the agreement").

The third significant difference between the licensee in the motion picture cases cited above and the book publisher in this action is that the licensees in the motion picture cases have actually created a new work based on the material from the licensor. Therefore, the right to display that new work—whether on television or video—is derivative of the right to create that work. In the book publishing context, the publishers, although they participate in the editorial process, display the words written by the author, not themselves.

Fourth, the courts in *Boosey* and *Bartsch* were concerned that any approach to new use problems that "tilts against licensees [here, Random House] gives rise to antiprogressive incentives" insofar as licensees "would be reluctant to explore and utilize innovative technologies." *Boosey,* 145 F.3d at 488, n. 4; *see also Bartsch,* 391 F.2d at 155. However, in this action, the policy rationale of encouraging development in new technology is at least as well served by finding that the licensors—i.e., the authors—retain these rights to their works. In the 21st century, it cannot be said that licensees such as book publishers and movie producers are ipso facto more likely to make advances in digital technology than start-up companies.

Other case law interpreting the scope of book publishing licensing agreements is similarly unhelpful to Random House. In *Dolch v. Garrard Pub. Co.,* 289 F.Supp. 687 (S.D.N.Y.1968), the district court found that a license granting the publisher "the exclusive right of publication of the books" included the right to publish the books in paperback. Besides the obvious distinction that the grant language in *Dolch* is far broader—there is no distinction between "book" and "work"—the *Dolch* Court was applying Illinois contract law—not New York—which is far stricter about the use of parol evidence. *See id.* at 695.

In *Dresser v. William Morrow & Co.,* 278 A.D. 931, 105 N.Y.S.2d 706 (1st Dep't 1951), *aff'd* 304 N.Y. 603, 107 N.E.2d 89 (N.Y.1952), the issue was whether an author could receive additional payments for reprint editions of his book when his publishing contract only provided for an "outright fixed payment." The *Dresser* court found that, under the terms of the contract, he could not. *Id.* at 932, 105 N.Y.S.2d at 707. The court relied on the fact that the contract was "at variance with the usual pattern of contracts between author and publisher." *Id.,* 105 N.Y.S.2d at 707. Here, although each contract is slightly different, none varies greatly from the usual pattern of contracts between author and publisher; therefore, there is no reason to depart from the usual meaning of such contracts.

In contrast to *Dresser* and *Dolch,* other federal courts applying New York law

have interpreted publishing licensing agreements more narrowly. *See Werbungs Und Commerz Union Austalt v. Collectors' Guild, Ltd.*, 930 F.2d 1021, 1026 (2d Cir.1991) (finding contract which conveys "right, title and interest in said two editions and all earnings therefrom" ambiguous as to whether it conveyed rights in the illustrations contained in those editions as well); *Field*, 89 F.Supp. at 613 (finding right to "publish, print and market in book form ... the work" is limited right and does not include publication of cartoon strip in a magazine).

### C. Balance of Hardships

■ Because Random House cannot establish a prima facie case of copyright infringement, it is not likely to succeed on the merits and is not entitled to a presumption of irreparable harm. Random House has made no showing of irreparable harm; therefore, it cannot meet the test for obtaining a preliminary injunction. Even if it could show such harm, and could be considered to have presented sufficiently serious questions about the merits to make them a fair ground for litigation, the balance of hardships does not tip decidedly in Random House's favor. Random House fears that Rosetta's ebooks will harm its goodwill with its customers and cause direct competition in Random House's own efforts to establish its ebook business. Rosetta worries that a preliminary injunction will effectively put its new company out of business because it will impede its ability to publish any works previously licensed to other publishers. While both parties present valid concerns, Random House has not demonstrated that its concerns decidedly outweigh Rosetta's.

### CONCLUSION

Employing the most important tool in the armamentarium of contract interpreta-tion—the language of the contract itself—this Court has concluded that Random House is not the beneficial owner of the right to publish the eight works at issue as ebooks. This is neither a victory for technophiles nor a defeat for Luddites. It is merely a determination, relying on neutral principles of contract interpretation, that because Random House is not likely to succeed on the merits of its copyright infringement claim and cannot demonstrate irreparable harm, its motion for a preliminary injunction should be denied.